# Exhibit 46, Part 2 of 6

Settlement is typically indicated in trade notes as "T + (number of days)." For settlement "T + 2," stocks and payment must be exchanged on day no. 2 counting from the agreement date. When counting days, only business days are to be counted. The number of business days varies from country to country.

Business days are determined by the market in the country where the stock is traded (*i.e.*, Denmark, in the case of Danish stocks).

According to (...), [Pension Plan C] purchased 375,802 stocks in Vestas Wind in March 2015 (...). The agreement was concluded on Monday, March 30, 2015, according to the commercial note, and settlement was to take place 'T + 6', *i.e.*, six business days later (...). According to the custody statement, delivery took place on Tuesday, April 07, 2015 (...).

Delivery thus took place according to the Danish public holiday calendar three working days after the conclusion of the contract, *i.e.*, T+3:

| | | | Stock issuer | Normal cycle | **Denmark** | England | USA |
|---|---|---|---|---|---|---|---|
| Settlement, stocks | | | | **Calendar** | | | |
| | CUM | Monday March 30, 2015 | | Trade Date (T) | Trade Date (T) | Trade Date (T) | Trade Date (T) |
| | | Tuesday March 31, 2015 | Dividend Ex-date | T + 1 | T + 1 | T + 1 | T + 1 |
| | | Wednesday April 1, 2015 | Dividend Record Date | Normal Settlement (T + 2) | T + 2 | T + 2 | T + 2 |
| | EX | Thursday April 2, 2015 | | Maundy Thursday | | T + 3 | T + 3 |
| | | Friday April 3, 2015 | | Good Friday | | | |
| | | Saturday April 4, 2015 | | | | | |
| | | Sunday April 5, 2015 | | | | | |
| | | Monday April 6, 2015 | | The day after Easter Sunday | | | T + 4 |
| | | Tuesday April 7, 2015 | | | **T + 3** | T + 4 | T + 5 |

*The grey boxes indicate weekends and public holidays in the countries concerned.*

It is noteworthy that delivery took place T+3 (*i.e.*, Tuesday, April 7, 2015), although delivery was agreed T+6. Delivery T+6 would have implied delivery on Friday, April 10, 2015. As the table shows, the delivery also does not correspond to either the English or the American public holiday calendar.
Delivery has therefore *not* taken place in accordance with the agreement.

*5.4.3.4  Commercial note indicates price as "#########"*

There is also an example of a trading note from the broker (...), where the price of the pension plan's sale of 7,884 Maersk stocks is indicated as " #########" (...). The price was DKK 12,290 per stock, *i.e.,* total DKK 96,894,360.

In such large deals, the responsible parties will of course check that the figures, including prices, are correct on the confirmation. It screams to the heavens and jumps out at you when the purchase price is listed as "#########."

The TVC Law Firm's explanation weakens pension plans' case. It is – according to TVC Law Firm – *"obviously a computer error,"* as if that matters in terms of whether you'd notice it.

The TVC Law Firm has submitted as (...) an email from the broker, (...) Capital London Ltd., which states that the error is due to the fact that the column in the underlying excel sheet was not large enough to contain the price. A new trading note (...) was submitted with the e-mail. This adds to the mystery. The signatory of the e-mail, (...), himself states that he is now employed by (...). Notwithstanding the fact that he is no longer employed by (...), he nevertheless issues a new commercial note on (...) letterhead by correcting the relevant Excel sheet. This seems very strange.

Furthermore, it is unreliable when (...) confirms in his e-mail of May 16, 2019 that the revised trading note *"accurately reflects"* the stock trade that should have been made on June 22, 2015, *i.e.,* 4 years earlier. Credibility is further weakened by the fact that it was not Adrian Milne himself, but Patrick Milne, who is listed as broker on the "original" trade notes.

### 5.4.3.5    Misdeclaration of settlement date

All the above errors and inconsistencies are found in the driver files. If one starts to re-examine the cases outside the master files, new errors will appear. For example, a trading note from the broker (...) concerning a trade in Coloplast stocks for [Pension Plan E] is presented. Here, the settlement date appears as December 9, 2012, which is not in accordance with either the custody statement (...) or Credit Advice (...).

### 5.5    There is no evidence of completed trades

There is no evidence that the pension plans' alleged stock trades were settled, *i.e.,* that the stock trades were effected by exchanging the parties' services (stocks and money).

According to the pension plans, the settlement/settlement of a stock deal is not a condition for obtaining ownership of the stocks, (...). However, it is evident that settlement is a precondition for the completion of a stock deal. If the seller does not hold stocks (including dividends) which the seller is entitled to sell, there is an injunction. If, as a result, settlement does not take place, stocks and money will not have changed hands and there will be no (completed) stock deal. After all, the buyer has never acquired any stocks. The same applies if the seller *has* stocks, but the trade is not completed for one reason or another.

There is *no evidence that at* any time stocks were held in a securities account of the pension plan custodian. And therefore, it is irrelevant that the custodian has "certified" the pension plans' ownership of stocks in Credit Advices and that the broker has confirmed "trades" in broker confirmations (...). A Credit Advice is just words on paper. And as stated in (...), a broker confirmation does not document that the stock trade was actually executed.

The vast majority of pension plans represented by TVC Law Firm have requested dividend reimbursements for more than one alleged stock purchase. All of the alleged trades involve extremely large amounts. When pension plans argue that liquidation/settlement is not necessary to acquire ownership rights, it just shows how weak the pension plans' case is when that kind of argument is used. Because in the real world, no more such agreements are made without settlement. And if it is not settled, there will be a subsequent court battle in which the party that loses money on such a failure to settle will claim damages from the other party.

Thus, there is no evidence that the pension plans (or their custodians) at any time held, let alone received, stocks. This means that there have never been any stock transactions. In this context, it is irrelevant whether the pension plans *believe* there have been stocks.

### 5.6    Terms of settlement are not market-compliant

Until October 06, 2014, the standard for stock trades in Denmark was that stocks were delivered three days after the contract was entered into (*i.e.,* settlement T+3). After October 06, 2014, the standard was delivery after two days (*i.e.,* T+2) (...). For the calculation of delivery time, only business days are taken into account – *i.e.,* neither weekends nor public holidays are taken into account.

The pension plans' explanation of the unwinding of the alleged stock trades is not consistent.

In (...), the pension plans state that settlement takes place two days after the conclusion of the contract, *i.e.,* T+2. In (...), it is stated that settlement takes place three days after the purchase, *i.e.,* T+3. Finally, the pension plans (...) indicated that they had chosen to follow the Danish rules for stock exchange trades (...), which the pension plans have clarified in the e-mail of April 24, 2019 to the effect that the settlement date for both OTC trading and trading on the stock exchange was two (previously three) days later than the trade date (*i.e.,* T+2 and previously T+3).

However, according to custody statements (...), the pension plans have consistently deviated from the market stance when purchasing stocks. Up to October 06, 2014, the stocks were purchased on terms T+4, according to the appendix, and after October 06, 2014, the stocks were purchased on terms T+3, according to the appendix.

In addition, according to broker confirmations, in some cases the pension plans have settled on completely different terms, *e.g.,* T+6 (...) or T+1 (...).

The information provided by the pension plans is therefore inconsistent with the material submitted. In all cases, the delivery time agreed was one day longer than that indicated by the pension plans in their submissions and longer than the market standard.

The deviation from market conditions in the custody statement (...) is noteworthy, as the deviation – even if there had been stock transactions and not just book entries – greatly facilitates fraud. This is due to the "timing" of distributions on the Danish market:

When a company decides to make a distribution, a *record date* is set. Those who are registered as deposit holders on that date will receive the dividend.

Once the *record date* is set, the *ex-date* (*ex-dividend date*) is set. The date is determined by the trading platform based on the *record date* and the market conditions for the delivery of stocks. The *ex-date* is the first day on which the stocks are traded without dividends, *i.e.,* the seller is paid the dividend even if the stock is sold.
Prior to October 6, 2014, the market standard was T+3 delivery. This meant that if you subscribed for stocks on Monday, August 11, 2014, you would receive the stocks (be registered as owner) on Thursday, August 14, 2014. Stocks therefore had to be acquired three days before the *record date* if one was to be registered as owner on the *record date*. In fact, trading two days before the *record date* would – under normal delivery conditions – mean that the stocks would no longer be received before the company determined the circle of owners for the purpose of paying the dividend – and thus *the seller* would receive the dividend. The *ex-date* was therefore two days before the *record date*.

Therefore, to be entitled to dividends, stocks had to be acquired at least three days before the *record date*. According to the market standard, you would then receive the stocks and be registered as an owner at the time when the distributing company determines the circle of owners and you would receive the dividend.

On October 6, 2014, the market standard was changed so that delivery takes place T + 2. This means that the *ex-date* became the day before the *record date* – *i.e.,* one day closer to the *record date* due to the shortened delivery time.

For the *sale of* stocks by the pension plans, according to their custody statement (...) they have followed the market trend, T+2 (after October 06, 2014).

However, in *buying* stocks, pension plans have deviated from the market standard. According to custody statements, the pension plans (...) acquired the stocks on the day before the ex-date (*i.e.,* on the last possible day on which the stocks could be acquired including dividends), but with 'delayed' delivery. Delivery took place T+3 (although the market standard was T+2) and thus the day after the *record date*. The pension plan therefore did not even receive the dividend directly from the distributing company or through its own sub-custodians, according to its own agreements. Instead, the alleged dividend was paid to a seller who was the custodian on the *record date* but who was obliged to continue the distribution since, according to the pension plans, the stock had been sold including the dividend (before the *ex-date*).

The pension plans thus claim to have been owners even though, according to custody statements, they were not registered as owners on the *record date*, as they acted on terms that differed from the market standard. This is an arrangement which will greatly facilitate fraud, as the pension plans will – will be registered as owners of the stock on the *record date* on which the company records the owners and pays the dividend. For the pension plans claim that they will get the stocks delivered *later* – and entitled to the dividend their seller receives.

Moreover, the extended delivery period, contrary to market standards, creates additional work and risks of loss. If the pension plans had followed the market standard, as they falsely claim in their submissions they did, a transfer of the proceeds from the seller of the stocks to the pension plans would be avoided. And pension plans would also avoid the risk that the stock seller would not pass the dividend on to them. In all of the Shah cases, this inconvenience and additional risk was chosen without any legitimate reason being given.

**5.7    The trades (and the profits)**

The pension plans have stated (...) that *"From 2015 onwards, trades were made using an algorithm trader, where the trustee simply had to approve the proposals. There is therefore no documentation of the conclusion of these trades,"* (...).

This explanation is simply too simplistic. Of course, there is evidence of multi-billion dollar stock purchases. Moreover, there is no "algorithm trader" that ensures that stock purchases are made by consecutive number, or that depends on which custodian the pension plan is affiliated with. It simply does not make sense. If there is an algorithm for pension plans, it must have been used solely to disguise the unreality of the alleged stock trades.

**5.8    It is unsubstantiated that net profit and reimbursement are swallowed up by costs**

The pension plans have indicated that their assets at year-end did not exceed $250,000 due to the high transaction costs associated with Div-Arb (*i.e.,* dividend arbitrage) investment opportunities (...).

Given the size of the alleged equity investments, there must indeed have been very significant costs associated with the transactions.

However, no evidence has been provided, including bank statements and invoices, that the pension plan incurred costs that could have reduced the pension plans' assets – including reimbursement and alleged net benefits received in the millions – to no more than $250,000, (...). The costs are not otherwise itemized, nor is there any evidence of who paid the costs, what benefits the costs cover or what contractual terms the costs are subject to.

Furthermore, it makes no sense for pension plans to agree to participate in dividend arbitrage investments if all profits were eaten up by costs. *Of course,* pension plans would have made a profit if they had actually participated in a complex stock trade et-up.

And there is the small but not insignificant detail that all pension plans represented by TVC Law Firm have refused to provide their own bank statements showing movements and balances.

**5.9    The Custody Agreement has not been complied with**

According to the pension plan, the relationship between the individual pension plan and its custodian from Sologruppen has been governed by a Custody Agreement and/or Terms and Conditions for Custody Services (...).

It appears from Paragraph 5.1 of the Custody Agreement submitted (...) that the pension plans were to transfer immediately to the pension plans' account with its custodian (the "Minimum Cash Balance"), upon conclusion of the agreement, an amount to secure the pension plans' obligations.

The starting amount of the guarantee was EUR 500,000. (...). In some cases, however, the security requirement is lower, (...), where only €20,000 was required.

The requirement for a minimum custodian fee is set out in all Custody Agreements and/or Terms and Conditions for Custody Services.

In all cases, the collateral is unrealistically low compared to the custodian's deposit for the pension plans' billion-dollar transactions.

In addition, *none* of the pension plans complied with the condition (...). On (...), the pension plans thus confirmed that *none* of them had transferred such an amount to its custodian (...).

The capital requirement constitutes a security for the custodian, which must of course be present *before* trading. The collateral is necessary because there *are* risks associated with trades. Considering that pension plans have no equity, the minimum capital requirement is even more relevant.

Therefore, it is clearly presumed that stock trading took place before the security deposit was made.

When the pension plans directly state that the pre-trade minimum capital requirement with the custodian has not been met by any of the plans, it shows that the Custody Agreement has not been met, but has merely been entered into/signed for show.

In (...), the pension plans stated that there was no minimum funding clause in early custodial agreements, and therefore *some of the* pension plans had realized enough profit to meet the requirement without making a deposit. As a result, the minimum amount requirement of the pension plans has been met by offsetting.

It is undocumented and has the presumption clearly against it. It is contrary to the custody statements provided (...), where it is stated on the first page of each custody statement (...) that the *"Opening Cash Balance"* for the pension plans in all years is DKK 0. In addition, according to the custody statement, no profit is generated by the custodian on the transactions, as shown in the *'Total Cash Balance'* (...). Thus, no gains are shown which could be used for offsetting. However, [Money Plan F] made a profit of USD 0.29 (...).

This also contradicts the pension plans' claim – albeit unsubstantiated like so many of their claims – that their gains are very small due to high costs, cf. 5.8. The pension plans where the claim was EUR 500,000 have an additional evidentiary problem. If they have such large assets, they have to file accounts with the U.S. tax authorities, see the Supporting Appendix, § 1.3, which of course applies when the assets are above USD 250,000.

An apparent exception to the lack of surplus is [Pension Plan D], whose account with Old Park Lane in 2014 was credited with cash payment/receipts of $927,100.27 and debited $19,952.02. It is undocumented what these items cover. At the end of 2014, these amounts were apparently in the account at Old Park Lane. However, the amounts disappear from 2014 to 2015, when [Pension Plan D] used a different Shah custodian, namely Solo Capital. As it is *both* undocumented where the amounts originated and where they went, this cannot be attributed any significance. In addition, the deposit/profit is in any case still less than the minimum amount of 500,000 euros at Old Park Lane (...). There is therefore no profit which would allow the deposit requirement to be waived.

Thus, according to the pension plans' own documentation, namely custody statements (...), the pension plans do not generate any profit that can be used to meet the minimum offset requirement. In fact, the account starts at 0 and, according to the custody statement, no profit is generated.

## 5.    THE SYSTEMATICS SHOW THAT THIS HAS BEEN A DESK-TOP EXERCISE

The tax authorities have carried out an investigation into the reimbursement requests and alleged stockholdings originating from pension plans represented by the TVC Law Firm, which have used custody statements from the Solo Group and which have provided information on the purchase of stocks (broker confirmations or custody statements). The findings of the investigation relate to <u>all</u> pension plans for which the TVC Law Firm filed complaints on behalf of the pension plans during 2018 – except for [Pension Plan G], which used a different custodian.

It turns out that all the transactions are systematized to an extent that only makes sense if they are centrally orchestrated transactions not involving stocks or money. So, systematization

transactions could <u>never take place</u> in reality. Indeed, the pension plans' alleged equity investments have been carefully aligned.

The systematics, which are elaborated in the following §§, cover, among other things:

- All stocks used for reimbursement on a given stock are purchased on the same day and at the same price (§ 6.1, below).
- Stockholdings are systematized so that no two pension plans own the same number of stocks. For the A.P. Møller Maersk stocks in 2015, it can even be seen that the stockholdings (with some gaps) are "consecutive," so that each pension plan owns one stock more than the previous one (§ 6.2, below).
- Although the stockholdings are of considerable size, in <u>all</u> cases it is possible to buy, lend, hedge and sell the stockholding together (§ 6.2, below).
- The investment profiles of pension plans are similar. They are thus the same assets that each of the pension plans claims to have owned (§ 6.3, below).
- In the alleged spring 2014 trades, all pension plans allegedly <u>purchased</u> stocks from the same broker, <u>sold</u> stocks to the same broker, entered into <u>forward agreements</u> with the same party, and <u>lent the</u> stocks to the same party (§ 6.4, below).
- The pension plans allegedly dispose of the stocks according to a fixed pattern, which, however, changes over time. For example, in 2014, all pension plans sell *either* in one day (*e.g.,* Coloplast stocks in December) or over a four-day period (*e.g.,* Novozymes stocks) (§ 6.5, below).
- Sanjay Shah, suspected as the main backer in the whole proceeds case, has controlled all four custodians used who have played a key role (§§ 6.6 and 6.7, below).
- Credit Advices are numbered consecutively across custodians, which on paper are independent legal entities (§ 6.8, below). Subsequent requests for reimbursement (submitted in 2017) also use the same numbering system (§ 6.9, below).

Despite all these similarities – and the fact that the pension plans have chosen the same lawyer and are filing identical briefs in the complaints – the pension plans maintain that they have nothing to do with each other (Paragraph 6.10, below).

The system shows that there cannot possibly be actual stock transactions. The system is only possible because it is an accounting exercise orchestrated centrally and without any basis in reality – either through cash flows or stockholdings.

Finally, two pension plans appear to have forgotten to claim reimbursement of some DKK 29.5 million for their alleged stockholdings, which can only be the case because no stock transactions have *actually* taken place (Paragraph 6.11, below).

**6.1    All pension plans buy on the same day and at the same price (new)**

In <u>all</u> cases, the pension plans acquired their stocks the day before the Ex-date, *i.e.,* the last day on which the stock could be acquired including the right to dividends.

*In addition,* the pension plans have paid *exactly* the same price for the stocks (the market closing price on the given day). However, this does not seem to apply to Chr. Hansen Holding stocks and Coloplast stocks in 2013 and [Pension Plan H's] purchase of Coloplast stocks in December 2014 (a total of 15 trades out of approximately 1,400 trades).

For example, according to their custody statements, 76 pension plans (...) purchased stocks in Novo Nordisk A/S on March 19, 2015. The pension plans have each purchased between 5.7 million stocks and 7.1 million stocks (corresponding to a purchase amount of between DKK 1.96 billion and DKK 2.44 billion). All stocks were acquired at the same price, namely DKK 341.9 per stock (see also §§ 4.1 and 6.1, above).

Although all pension plans claim to have used the same investment strategy, and although it is not unusual to use the closing price for stock trades, it is striking that the pension plans have had such similar trading patterns. For example, it takes quite a lot of work to gain access to buy such a significant size of stocks for each pension plan. Once you have a deal with one or more sellers, you will want to close it as quickly as possible to retain the seller. And there is a tremendous amount of work to close 76 stock purchases with a value per piece of about $2 billion.

### 6.2    The size of stockholdings is systematized

For the pension plans that have bought the same stocks on the same day and at the same price, the size of the stockholdings is also systematized. There are thus no cases where two pension plans have bought the *same* number of stocks.

(...) shows how the alleged holdings are systematized across pension plans. The appendix contains a number of summaries of the number of stocks that the pension plans, according to their submitted Credit Advices, should have held over the dividend date. The summaries are based on all Credit Advices (...) received by the Danish Tax Agency from pension plans using the Solo Group and on which the Danish Tax Agency has paid dividend reimbursements. In addition to the pension plans represented by the TVC Law Firm, other U.S. and Malaysian pension plans are included, whose names have been anonymized in the appendix.

The statements have been sorted by the number of stocks that the pension plans, according to their submitted Credit Advices, should each have owned over the dividend date. The number of stocks is increasing from top to bottom.

All the charts illustrate that the number of stocks has a direct correlation with who is the custodian of the pension plans. The system works in such a way that there are 3 ranges according to which the number of stocks is recorded. The smallest range is controlled by West Point and Telesto, the largest range is controlled by Solo Capital, and the range in the middle is controlled by Old Park Lane.

The chart in (...) (Maersk A-stocks), for example, illustrates that West Point and Telesto control the accounting in the range 7,717 – 8,193. The table shows the number of Maersk A Stocks that the pension plans claimed to hold above the dividend date of March 31, 2015 according to their Credit Advices. The pension plans include [Pension Plan F], [Pension Plan C] and [Pension Plan B], all of which are lead cases. Their trustees, who reportedly "*give all orders for all transactions*" (...) and who had '*no direct or indirect connection or knowledge of all the other pension plans*' (...), are (...), (...) and (...) respectively.

As can be seen (...) there is no overlap between the number of stocks claimed to be held by the pension plans above the dividend date. In the overview of the Maersk A-stocks (...) and Maersk B-stocks (...), the number of stocks is even consecutive with only a few "gaps." The third pension plan in the series claims in its Credit Advice to have owned 7,840 Maersk A stocks, the next pension plan claims to have owned 7,841 Maersk A stocks, the next again 7,842 Maersk A stocks and so on.

It makes no sense whatsoever for pension plans that have no knowledge of each other – and who were reportedly supposed to control their own alleged stock trades – would act in such a pattern. It goes without saying that this pattern is no mere coincidence.

The consecutive number of stocks was merely a smokescreen intended to hide the reality from the Danish Tax Agency, namely that all alleged purchases of stocks are fictitious and designed solely to improperly obtain dividend distribution.

_____

In *all* cases, pension plans manage to find

- one seller,
- one buyer,
- one stock borrower and
- one forward contracting party,

who will trade these quite abnormally large stockholdings for *precisely* the amounts that the pension plan has "wanted." This applies to these very substantial stockholdings – and in all cases.

This means that pension plans have never failed to find counterparties for large transactions. And it means that at no point did the pension plan have to split the transaction in two or only partially complete the transaction.

It can't be done for just one pension plan. Nor can it be done in so many cases.
The pension plans' claim is therefore unrealistic to the second degree.

**6.3    Pension plans have nearly identical stock portfolios (new)**

According to the pension plans' custody statements (...), the pension plans that traded stocks in 2015 had exactly the same stock portfolio and traded the same 14 Danish stocks in 2015.

This concerns 77 pension plans out of the more than 100 pension plans for which the TVC Law Firm filed complaints in 2018. As an example, six pension plans' investments in 2015 are shown here, including the lead case [Pension Plan C]:

| Name ("pension plan")<br><br>*SANST ref.* | [Pension plan C]<br><br>*(...)* | [Pension plan I]<br><br>*(...)* | [Pension Plan J]<br><br>*(...)* | [Pension Plan K]<br><br>*(...)* | [Pension Plan L]<br><br>*(...)* | [Pension Plan M]<br><br>*(...)* |
|---|---|---|---|---|---|---|
| A.P. Møller Maersk A/S – A | 7,880 | 7,865 | 7,849 | 7,851 | 7,892 | 7,871 |
| A.P. Møller Maersk A/S – B | 7,884 | 7,871 | 7,864 | 8,069 | 7,893 | 8,079 |
| Carlsberg A/S – B Coloplast | 18,0314 | 178,346 | 178,352 | 178,402 | 181,135 | 177,618 |
| Coloplast A/S – B | 292,365 | 294,517 | 295,956 | 293,038 | 295,514 | 295,238 |
| Danske Bank A/S | 3,026,108 | 3,399,185 | 3,080,069 | 3,332,339 | 3,293,014 | 2,978,112 |
| DSV A/S | 824,244 | 685,834 | 759,755 | 776,849 | 776,849 | 804,456 |

| | | | | | | |
|---|---|---|---|---|---|---|
| FLSmidth & Co A/S | 81,040 | 80,155 | 80,283 | 80,292 | 81,548 | 79,791 |
| GN Store Nord A/S | 588,285 | 552,691 | 626,259 | 588,941 | 581,185 | 591,435 |
| Novo Nordisk A/S – B | 6,267,033 | 5,887,844 | 6,671,570 | 6,274,023 | 6,191,398 | 6,300,588 |
| Novozymes A/S – B | 688,545 | 686,764 | 686,991 | 776,240 | 797,000 | 814,004 |
| Novozymes A/S – B Pandora A/S | 416,809 | 468,196 | 424,241 | 458,988 | 453,572 | 410,198 |
| TDC A/S | 3,092,779 | 3,296,713 | 2,766,412 | 2,886,717 | 2,957,050 | 3,205,055 |
| Tryg A/S | 34,618 | 34,976 | 34,540 | 34,742 | 35,067 | 34,793 |
| Vestas Wind Systems A/S | 375,802 | 374,281 | 373,968 | 376,685 | 374,009 | 378,845 |
| **Grand total** | **15,883,706** | **15,955,238** | **15,994,109** | **16,022,572** | **16,033,126** | **16,086,083** |

(...)

For stock trades made in 2014, it can be seen that pension plans traded among the same 12 stocks. In 2013, all pension plans traded among the same two stocks.

This too is highly curious if, as TVC Law Firm claims, the pension plans are all independent of each other. On the contrary, it makes perfect sense when it is a desk exercise aimed at inducing the Danish State to make unjustified payments.

**6.4     All pension plans deal with the same parties (news)**

A review of the pension plans' custody statements (...) shows that stock trades made in spring (February to May) 2014 were concluded with exactly the same contracting parties. This applies to all transactions for all pension plans represented by the TVC Law Firm for which a complaint was filed in 2018 and custody statements and/or broker confirmations were submitted (...).

As (...), a chart is provided illustrating the pension plans' contracting parties in alleged purchases of A.P. Møller Maersk A/S A-stocks in 2014, including one of the pension plans from the lead cases (marked in red in the appendix).

As can be seen, the broker (...) handles all transactions relating to the purchase of stocks. Furthermore, it appears that the broker (...) handles the sale of stocks, that (...) is the contracting party to forwards and that (...) is the contracting party to the GMSLA. However, for some of the alleged stock transactions, there is no information on the contracting parties of the pension plans on forwards and GMSLAs.

It is quite unlikely that "independent" pension plans make multi-million dollar stock trades with exactly the same counterparties. Again, this shows that the fictitious stock deals are constructed from the center.

*In addition,* it is highly unlikely that the same parties can provide liquidity and risk coverage on the extremely large scale demanded. It is already completely undocumented and untrue that the equity borrower would be able to provide funding for just one pension plan's extraordinarily large equity purchases. It is impossible that the stock borrower could finance *many* pension plans at the same time.

The same applies to the forward contracting party. It is unlikely (and undocumented) that one company (domiciled in a tax haven) could hedge the trades of a large number of pension plans for millions of kroner.

### 6.5    Time of sale is systematized (new)

For the 2013 and 2014 stock trades, *either* the same sell date is used for all trades of a specific stock across pension plans, or all pension plans sell their stock positions within four days

For example, 20 pension plans, including the lead case [Pension Plan N], allege that between June 16 to 19, 2014 they all sold their Novozymes stocks purchased on February 26, 2014 (...). It is striking that 20 pension plans, claiming to be independent of each other, each arrive at the conclusion that the Novozymes stocks were to be 'held' for almost 4 months and then suddenly disposed of within a few days.

Another example is 23 pension plans that sold Coloplast stocks on December 17, 2014 (compilation of data from the pension plans' (...) – the leaders are highlighted):

| Shareholder (Pension Plan) | Amount of stocks (Coloplast) | Sale (Trade date) |
|---|---|---|
| [Pension plan O] | 997,67 | December 17, 2014 |
| [Pension plan P] | 919,16 | December 17, 2014 |
| [Pension plan Q] | 1,063,10 | December 17, 2014 |
| [Pension plan B] | 998,99 | December 17, 2014 |
| [Pension plan E] | 1,016,17 | December 17, 2014 |
| [Pension plan R] | 928,52 | December 17, 2014 |
| [Pension plan S] | 950,51 | December 17, 2014 |
| [Pension plan T] | 1,002,63 | December 17, 2014 |
| [Pension plan U] | 1,074,21 | December 17, 2014 |
| [Pension plan V] | 1,020,07 | December 17, 2014 |
| [Pension plan D] | 1,046,89 | December 17, 2014 |
| [Pension plan W] | 997,58 | December 17, 2014 |
| [Pension plan X] | 1,015,15 | December 17, 2014 |
| [Pension plan Y] | 1,095,42 | December 17, 2014 |
| [Pension plan Z] | 990,46 | December 17, 2014 |
| [Pension plan AE] | 930,20 | December 17, 2014 |
| [Pension plan Ø] | 907,16 | December 17, 2014 |
| [Pension plan Å] | 933,55 | December 17, 2014 |
| [Pension plan AA] | 1,073,34 | December 17, 2014 |
| [Pension plan H] | 1,087,68 | December 17, 2014 |
| [Pension plan AB] | 931,26 | December 17, 2014 |
| [Pension plan AC] | 998,14 | December 17, 2014 |
| [Pension plan AD] | 975,44 | December 17, 2014 |

In all of these cases, the pension plans claim that they had purchased the stock on December 4th. It is striking that 23 independent pension plans all had to decide to "own" the stocks in *exactly* 13 days.

The examples show how the alleged stockholdings are systematized across the pension plans.

_____

In 2015, it seems that a different system has been applied for the liquidation of "stockholdings." The pattern is changing so that instead of selling on the same day or in a very few days, pension plans are starting to dispose of their stocks over a period of about two months.

However, it is still clear that the actions are systematized from a central location. The distribution of the sales suggests rather that the sizes of the trades are sought to be masked.

There is thus a sharp division between the four custodians in the Solo group. At no time are two custodians selling the same stocks on the same day.

This can be illustrated by (...) showing that Maersk A-stocks allegedly purchased on March 31, 2015 are very likely sold on different dates depending on the custodian. For example, Old Park Lane sells stocks on June 2, 2015, Telesto sells stocks on June 3, 2015 and Solo Capital sells stocks on June 8, 2015.

The timing of the sale of the stocks by the Shah-controlled custodians is thus coordinated centrally, supporting the view that the stock dealers are merely a fictitious construct created for the purpose of obtaining unjustified dividend tax reimbursements.

**6.6    Sanjay Shah controlled the pension plan custodians (Solo Group)**

The pension plans represented by TVC Law Firm have all (except one ([Pension Plan G])) used one or more of four custodians: Old Park Lane, Solo Capital, Telesto and West Point. Together, these four custodians make up the Solo Group.

The Solo group is only known to the Danish Tax Agency from these cases.

The four companies are all largely controlled by Sanjay Shah, who is being investigated by the Danish, British and German police in connection with the extortion case as one of the suspected masterminds behind the fraud.

Solo Capital Partners LLP, company number OC367979, was founded in September 2011. The company was founded by Sanjay Shah and Solo Capital Limited. Solo Capital Partners LLP is currently in receivership and is being treated as under "Special Administration" in England due to the alleged crimes committed in the company. The company was previously owned by the Luxembourg company, Aesa SARL, owned by Sanjay Shah, and Sanjay Shah was previously the Managing Director of the company. A large number of the Credit Advices submitted by Solo Capital are signed by Sanjay Shah personally (...).
Old Park Lane Capital PLC was owned at the dates of payment by a number of stockholders, one of the largest stockholders being Aesa Holdings (UK) Limited, which has subsequently changed its name to Solo Group Holdings Limited and is owned by Aesa SARL, which is owned by Sanjay Shah.

<u>Telesto Markets LLP</u> was in 2015 owned by Solo Group Holdings Limited, which as mentioned above is owned by Aesa SARL, which as mentioned above is owned by Sanjay Shah.

<u>West Point Derivatives Ltd</u> was in 2014 b.l.a. owned by Hooloomooloo Holdings Limited, which is owned by Sanjay Shah.

Previously, the pension plans claimed that they had no knowledge of whether these 4 custodians *"belonged to the same group of companies."* This was based on the *assumption of* the Danish Tax Agency that (...).

Later, pension plans *radically* changed their explanation of these 4 custodians.

On (...), the pension plans thus stated, as a novelty, that *"Solo Capital was the overall custodian in relation to Old Park Lane, Telesto and West Point."* and that all the pension plans' money was held in Solo Capital's bank account, (...), and (...). And in (...) the pension plans consistently refer to the 4 custodians as the *"Solo Group."*

The four custodians Old Park Lane, Solo Capital, Telesto and West Point together form the Solo group and have been controlled by Sanjay Shah.

**6.7        Custodian: Sanjay Shahs "universe"**

The four custodians in the Solo group (Solo Capital, Old Park Lane, Telesto and West Point) have together produced documentation that has been used to obtain over DKK 9 billion in dividend reimbursements from the Danish state. The documentation covers alleged stockholdings with a market value (at the time of distribution) of approximately DKK 1,354 billion. The documents produced are intended to show that the Solo group held very substantial stockholdings for its clients, *i.e.,* the pension plans, and that the stockholdings in question had been subject to dividend payments and dividend tax, which the pension plans then claimed back from the Danish Tax Agency.

However, subsequent checks have revealed that, although the Solo group has certified that it holds stocks from which gross dividends totaling DKK 33.4 billion have been paid, there is no objective evidence – or even a trace – that the Solo group held a single stock (§ 5.1, above). The only 'evidence' of the stockholdings are the documents produced by the Solo Group itself.

Indeed, an examination of the documents provided by the Solo-group to the pension plans reinforces the impression that the Solo-group did not hold stocks on behalf of the pension plans, but only produced documentation for the sole purpose of obtaining dividend payments:

<u>Credit Advices</u> are numbered consecutively across the 4 custodians, even though they are independent legal entities (§ 6.8, below). Credit Advices that fit *early* in the numbering range have also been attempted to obtain reimbursement *late* in the process (in 2017) (§ 6.9, below), illustrating that they are shadow documents with no reality.

Alleged <u>stockholdings</u> are – as shown in § 6.1-6.5 – systematized across the Solo group. The amount of stockholdings certified by each custodian is closely aligned, which can only serve to obscure the system and the consistency from the tax authorities. Moreover, in some cases, the size of the pension plans' stockholdings is seen to be "consecutive"; *i.e.,* each pension plan on the list holds one stock more than the previous one.

The Custody Agreement has not been complied with as the pension plans have not paid the required Minimum Cash Balance at any time (Paragraph 5.9, above). The Custodian has thus not had any security, which would be unacceptable if stocks were actually traded (see also Paragraph 3.2, above), as the Custodian was supposed to guarantee the execution of the transactions.

Custody statements (...) do not show daily movements on either general cash accounts or on stock accounts (and holdings) (Paragraph 5.2, above). Regardless of their designation, the supporting documents presented as (...) do not therefore constitute custody statements proper and do not document stockholdings.

Accounting summaries have been prepared subsequently by the pension plans' representative for the purpose of this case (§ 5.3, above). They are flawed and contain information which does not appear in the supporting documents. The statements therefore have no probative value.

Taken together, the errors and deficiencies, together with the systematic nature of the pension plan documentation provided by the Solo Group, are clear indicators that the pension plans never owned stocks, but that they were a single and complex fraud.

**6.8    Credit Advices are numbered consecutively across the Solo group**

In connection with the Danish Tax Agency's decisions to revoke previous decisions on the reimbursement of withheld dividend tax and to reject new reimbursement requests, the Danish Tax Agency has registered all Credit Advices submitted with the reimbursement requests, including Credit Advices issued by the Solo Group. The Danish Tax Agency's registration of Credit Advices from the four custodians in question covers approximately 3,400 Credit Advices, which have formed the basis for reimbursement requests totaling approximately DKK 9 billion.

The Danish Tax Agency's records show that Credit Advices from the four Shah-controlled custodians – which are legally independent entities – are numbered by the respective custodians themselves, and that the numbering is *continuous*. The registration also shows that there are no duplicates in the Credit Advice ID numbers from these four custodians. There are a few "gaps" in the numbering, *i.e.,* Credit Advice ID numbers which are apparently not used.

The sequential numbering of the Credit Advices issued by Solo Capital, Old Park Lane, Telesto and West Point "jumps" between these four custodians. This can be illustrated by the following extract from the Danish Tax Agency's registration (...):

Credit Advice ID 2533-2578: Telesto
Credit Advice ID 2579-2619: West Point
Credit Advice ID 2620-2659: Solo Capital
Credit Advice ID 2660-2701: Old Park Lane
Credit Advice ID 2702-2746: Solo Capital
Credit Advice ID 2747-2788: Old Park Lane
Credit Advice ID 2789-2830: Telesto
Credit Advice ID 2831-2871: West Point

Concrete (anonymized) examples of sequential numbering are the following, (...):

Example 1:

Credit Advice ID 2788: Old Park Lane                          March 17, 2015
Credit Advice ID 2789: Telesto                               March 17, 2015

Example 2:
Credit Advice ID 2904: Solo Capital                          March 23, 2015
Credit Advice ID 2905: Old Park Lane                         March 23, 2015
Credit Advice ID 2906: Solo Capital                          March 23, 2015

Example 3:
Credit Advice ID 2935: Solo Capital                          March 23, 2015
Credit Advice ID 2936: Telesto                               March 23, 2015

Example 4:
Credit Advice ID 2955: Old Park Lane                         March 23, 2015
Credit Advice ID 2956: Telesto                               March 23, 2015
Credit Advice ID 2957: West Point                            March 23, 2015

Regardless of whether these 4 custodians (despite using different letterhead) should have used the same back office, (...), it makes no sense that the total of approximately 3,400 Credit Advices are consecutively numbered across the companies.

And *if* the four custodians have had the same back office (...), it does not make sense that they have used such a different layout for their Credit Advices:

(...)

These are four legally independent entities. The consecutive numbering does not make sense – even if it is within the same group. And *if* it were a legitimate arrangement with group companies, the differences in layout do not make sense.

It thus underlines that the arrangement as far as the issuance of Credit Advices is concerned is orchestrated from the central level. The Credit Advices issued are not an expression of reality, but merely an element in the deliberate production of requests for dividend distribution without ownership of stocks.

In a number of cases, pension plans that have been wrongly reimbursed dividend tax and other newly established pension plans have *subsequently* (*i.e.,* after the fraud was discovered) submitted additional merger requests for several hundred million DKK, which were however rejected by the Danish Tax Agency on the grounds of lack of evidence of ownership of stocks and receipt of net dividends. Also, in connection with these subsequent requests, the pension plans have referred to the Credit Advice of the Solo Group

More importantly, the submitted Credit Advices fit into the consecutive numbering system (...), regardless of the fact that they were submitted later.

This consecutive numbering of Credit Advices issued by the 4 Shah Custodians is quite a marked illustration of the systematic fraud of the reimbursements.

**6.9      Credit Advices from Solo Group were used for fraud attempts in 2017**

On February 1, 2017, the Danish Tax Agency received 34 requests for reimbursement of dividend tax via the current IT solution, all of which were identified as suspicious by the Danish Tax Agency's dividend department. The requests were therefore forwarded to Special Control.

The 34 requests from U.S. pension plans were all submitted by the agent (...), who was unknown to the Danish Tax Agency. The requests were submitted on behalf of 34 U.S. pension plans and amounted to between DKK 290,835 and DKK 1,479,587. In total, more than DKK 25 million was claimed. Of the 34 pension plans, 29 are named after (...).

A review of the attached "documentation" showed that the Credit Advices in question were issued by Telesto (8), West Point (8), Old Park Lane (9) and Solo Capital (9). These Credit Advices were numbered in such a way as to fit into the 'gaps' in the sequential numbering of Credit Advices as set out above, but also in such a way that there continued to be no duplication of values.

It makes no sense for new (unknown) pension plans to submit additional Credit Advices 1½ years later that fit in the middle of the chronology of Credit Advice numbers. This indicates very strongly that these are prefabricated "drawer documents" that fit into a large, overarching system.

Finally, due to the current electronic application procedure, it was possible for the Danish Tax Agency to check the 'digital footprint' of each uploaded document, which was not possible with the previous physical application procedure (Supporting Appendix, § 2). A review of the uploaded documents relating to the 34 pension plans showed that Sanjay Shah was listed as the author on all credit advices issued by both Solo Capital and Old Park Lane (18 documents in total) (...).

The Danish Tax Agency, Special Control, issued proposals for decisions in the *34* cases. In all cases, the proposal was that the request would be rejected, as the pension plans had not documented ownership of the stocks and receipt of net dividends. Copies of the proposals were sent to the agent (...).

(...) subsequently submitted *35* letters objecting to the Danish Tax Agency's draft decision. In other words, objections were sent in a *non-existent* case, *i.e.,* a case where no request for reimbursement was ever made to the Danish Tax Agency and where the Danish Tax Agency therefore did not make a proposal for a decision (...).

The Danish Tax Agency decided to reject the requests on June 01, 2018. The decisions have been appealed.

When, as is evident, the same methodology and the same basis for claiming reimbursements is used as in the present case, it becomes clear that the systematic fraud in the reimbursement of dividend taxes is not only historical but also of future importance.

### 6.10    Pension plans have maintained that trades were not managed centrally

Throughout the proceedings, the pension plans have maintained that there is no complex and that the pension plans have been completely independent of each other.

This position is reflected, for example, in (...):

> "Our general response to these allegations is that _the individual [pension plan] has no direct or indirect_ _connection or knowledge of all the other pension plans_ that also appear to have purchased Danish listed stocks under a similar investment strategy. The _[pension plan] has at no time had knowledge of the_ _identity of all the other pension plans with a similar investment strategy._

*strategy on the same or other trading platforms by the same or other brokers, investment managers, etc. "* (my underlining)

Furthermore, pension plans have described how it was the pension plans themselves that bought and sold the stocks. the TVC Law Firm has noted that the trustee of the pension plans *"had online access via Solo's web portal to view and manage all transactions on a daily basis,"* (...).

On (...), the pension plans also provided a list of Authorized Signatories of Trust, (...), and a list of Authorized Traders of Trust, (...). Both lists are said to relate to [Pension Plan B] and the only person on the lists is (...) – [Pension Plan B's] trustee.

Finally, the pension plans have also submitted correspondence between (...), which must belong to [Pension Plan B], and the broker (...) concerning stock purchases, (...), as well as the pension plans have also noted that the custodian was not authorized to act on behalf of the pension plans, (...).

Pension plans' description of,

- that the trustee should *"manage all transactions on a daily basis,"* (...),
- the pension plans had *"no direct or indirect connection or knowledge of all the other pension plans'* or *'knowledge of the identity of all the other pension plans with a similar investment strategy*,*"* (...); and
- the custodian was not authorized to trade stocks on behalf of the pension plans, (...),

is in no way related to the *collective* and *coordinated* investment strategy of pension plans, as illustrated by the alleged stock trades.

**6.11    Two pension plans forgot to apply for reimbursement (new)**

Two pension plans represented by TVC Law Firm apparently forgot to seek re-merger of dividend tax for their alleged stock holdings.

This is [Pension Plan Q], which has not claimed reimbursement for stocks acquired in 2015:

| Stock | Number of stocks | Dividend tax withheld |
|---|---|---|
| A.P. Møller Maersk A/S – B | 8,094 | DKK 4,307,383.98 |
| Carlsberg A/S – B | 179,556 | DKK 436,321.08 |
| Coloplast A/S – B | 294,759 | DKK 358,132.19 |
| Danske Bank A/S | 3,578,514 | DKK 5,314,093.29 |
| DSV A/S | 823,723 | DKK 355,848.23 |
| FLSmidth & Co A/S | 80,747 | DKK 196,215.21 |
| GN Store Nord A/S | 630,605 | DKK 153,237.02 |
| Novo Nordisk A/S – B | 6,717,867v | DKK 9,069,120.45 |
| Novozymes A/S – B | 822,009 | DKK 665,827 |

| Pandora A/S | 492,896 | DKK 1,197,737.28 |
|---|---|---|
| TDC A/S (March) | 3,090,704 | DKK 834,490.08 |
| Tryg A/S | 35,072 | DKK 274,613.76 |
| A/S | 378,092 | DKK 398,130.88 |
| A.P. Møller Maersk A/S – A | 7,894 | DKK 4,200,949.98 |
| TDC A/S (August) | 1,092,245 | DKK 294,906.15 |
| **Sum** | | **DKK 28,057,006.87** |

In addition, [Pension Plan E] has not applied for reimbursement of a stockholding of 1,475,613 Coloplast stocks acquired in 2015, which would have included DKK 1,792,869.80 in the custody statement (…).

It makes no sense that the pension plans could miss out on being paid such substantial amounts, which were allegedly used to cover significant costs associated with this arrangement (Paragraph 5.8, above), or which the pension plans should in any event believe they are entitled to if they maintain that they are entitled to the reimbursements at issue in this case.

On the other hand, it makes sense that a single pension plan or accounting entry can disappear into the crowd in a fraud that at the Solo Group has been around DKK 9 billion and involved well over 100 pension plans and many thousands of alleged stock traders.

Pension plans claim they have very small gains, as the gains are eaten up by undocumented expenses. If this is true, then the two pension plans are missing a significant amount of money and thus have a significant outstanding balance that has not been paid. The alleged counterparties would discover this. The fact that they have apparently not discovered it merely shows that the whole thing is a paper exercise – and does not reflect real cash flows.

## 7.    FORMALITIES

### 7.1  Burden of proof

It is the pension plans that have requested reimbursement of withheld dividend tax and it is thus also the pension plans that have the burden of proof that the conditions for reimbursement of dividend tax are fulfilled, cf. *e.g.,* UfR 2003.2312/3H. The pension plans do not dispute this, (…).

It is irrelevant whether the pension plans have submitted documents at the time of application, which – if they had been correct – were sufficient documentation according to the Danish Tax Agency's working procedures in 2015, cf. (…). What matters is whether, on the basis of the information in the case, the Danish National Tax Tribunal considers that the pension plans have proved that they met the conditions for reimbursement of dividend tax.

The pension plans' explanation of the transactions that should have entitled to dividend distribution is not transparent, see § 2.4, above, and the burden of proof is therefore increased, see *e.g.,* UfR 1998.898 H.

In addition, the pension plans' supporting material is flawed and deficient and their explanations and pleas incoherent and shifting to such an extent that the burden of proof must be *further* increased, see Paragraphs 3-6, above, and Paragraph 8, below, and *e.g.,* SKM2019.250.ØLR. The pension plans, on the other hand, argue that the burden of proof has shifted so that the Danish Tax Administration Authority is most likely to bear the risk of doubt due to the passage of time and the tribulations of reimbursement. In this context, the pension plans are hiding behind the fact that the Danish and English authorities have seized material from their custodians (…) and that the Danish Tax Agency should obtain material from the SØIK (…).

The Danish Tax Agency disputes that the burden of proof can be reversed in this way, even taking into account the nature of the cases. The pension plans have claimed reimbursements in the period 2012–2015 on the basis of very large alleged stockholdings. Each of the pension plans has thus made investments worth many millions of kroner – and in many cases even several billion kroner. The cases were (in the lead cases) commenced by the issuance of proposed rulings on March 23 and 24, 2017, and thus a few years after the payouts – and at times when accounting records should still be filed under both Danish and U.S. law.

TVC Law Firm represents more than 100 pension plans. It is simply not true that all these pension plans have been so reckless as to not even have any physical or electronic documentation of their past stockholdings (which formed the basis of their reimbursement claims).

It is striking that the pension plans have failed to provide, in 5 submissions and over 4,000 pages of supporting material, relevant material which *must* be in their possession if, as they claim, stock dealing has taken place:

- The pension plans have not provided their own statements. Statements of account have not been provided for either the cash or the equity holdings of the pension plans. It goes without saying that the pension plans are in possession of this material.

- There is no evidence that the pension plans have received the alleged net dividends or dividend distribution, (...).

- There is no evidence of cash flows, including cash collateral and payment for stocks. There is therefore no evidence that settlement has taken place, *i.e.,* that the alleged stock transactions have actually been carried out.

- According to the pension plans' own information, they have earned millions of kroner from the transactions. An example of this is [Pension Plan B] (...). In 19 cases [Pension Plan B] has, according to its own statement, traded stocks and thereby earned an amount which 'by chance' is almost as large as the dividend distribution, (...). The pension plans have not even attempted to provide the Danish National Tax Tribunal with an answer as to where their very large profits have gone. This is an example of how unrealistic the pension plans' attempts at argumentation are. When the story doesn't add up, well, that's just because it's wrong.

- Only a few of the GMSLAs invoked (...) have been provided and these are undated, unsigned and incomplete. In addition, in most cases the pension plans are not contractual parties.

- There is no evidence of the alleged pledge of the arbitrage proceeds (and the additional funds of the pension plans) to the GMSLA co-contractors and/or the custodian/Solo Capital, pursuant to the TTC clause.

Instead, pension plans have emerged with a series of shifting explanations and a significant volume of documents. When the pension plans' explanations are compared with the documents submitted by the pension plans during the preparation of the cases before the Danish Tax Appeals Agency, it appears that

the pension plans have never owned Danish stocks. The available information, however, points in the opposite direction, cf. UfR 2003.2313/3 H. The "documentation" is in fact flawed to an unnaturally large extent.

There is no doubt in the matter; there is no evidence of the alleged stock deals and there are too many errors in the evidence provided by the pension plans to support their "story." In the National Tax Tribunal's view, if there is any doubt, it is only because the pension plans have failed to produce documents that *must* be in their possession. This must be to their evidential detriment and is contrary to their statement that they would disclose the files, (...).

**7.2        Annulment or revocation – invalid decisions can be revoked**

In (...), the pension plans claim that the Danish Tax Agency should have revoked its original, <u>valid</u> dividend tax reimbursement decisions, (...), even though no <u>new facts</u> have emerged in the cases since the payment decisions, (...). This is a misunderstanding of both the facts and the law.

The pension plans now correctly state in (...) that <u>legal circumstances</u> must be understood as meaning that the Danish Tax Agency's revocation decisions amount to an <u>annulment of</u> the original decisions on the ground that they were *unlawful* and therefore *invalid*.

Thus, the decisions for [Pension Plan C], [Pension Plan B] and [Pension Plan F] state that (...):

> *"[Name] has therefore not demonstrated that [name] qualifies for a reimbursement of Danish withholding tax under Article 10 of the Double Taxation Treaty between Denmark and the United States.*
>
> *(...)*
>
> *The Danish Tax Agency's decisions to reimbursement dividend tax to [name] are therefore wrongly based.*
>
> *The Danish Tax Agency therefore revokes the previous decisions on reimbursement of dividend taxes."*

Similar wording appears in the Danish Tax Agency's decisions in the other drivers' cases.

As can be seen, the decisions state that the conditions for reimbursement were not met and that the decisions to pay were taken on *an erroneous* basis. The Danish Tax Agency's decisions are therefore *not* a recall of a *valid* decision. It is therefore incorrect for the pension schemes to state that "*The Danish Tax Agency itself considered that the original decisions on the payment of the dividend tax reimbursement were legally valid, since otherwise the Danish Tax Agency would have had to take a decision to annul these earlier decisions,*" (...).

It is irrelevant whether the Danish Tax Agency has called the decision "revocation' or 'annulment," (...). The financial plans cannot rely on the heading. In addition, the terms "revocation" and 'annulment' are not used consistently. In SKM2011.501.HR, the Supreme Court ruled that the Danish Tax Agency could "*revoke*" (not cancel) a license because it lacked a legal basis, *i.e.*, because it was invalid. The judgment illustrates how the concepts are (to some extent) used synonymously.

Since the pension plans never owned the stocks claimed, nor were they entitled to the dividends, the Danish Tax Agency's original dividend tax reimbursement decisions are invalid and the Danish Tax Agency was therefore both entitled and obliged to annul the decisions. For invalid decisions, the *clear starting point is that* such decisions cannot be upheld, see *e.g.,* SKM2011.501.HR. This is also clear from Administrative Law – General Topics, 6th edition, Chapter 8, pp. 517-518, to which the pension plans refer (...). The considerations on revocation referred to by the pension plans are thus of no relevance to the present case.

The facts are set out above and in (...). As can be seen, the Danish Tax Agency now has a number of items of information that were not available at the time of payment. It is therefore incorrect for the pension schemes to state that in the present case the Danish Tax Agency "*does not appear to be in possession of any genuinely new factual information in the matter,*" (...). When the Danish Tax Agency paid dividends to the pension plans' agent, the Danish Tax Agency was not aware of the large-scale reimbursement fraud. Nor did the Danish Tax Agency have any reason to believe that the basis for the requests was without substance.

The conditions for annulment/revocation of the earlier decisions are thus met, since the decisions are irremediable.

Even if the Danish Tax Agency can be blamed for not having carried out a proper check of each individual request for reimbursement, this does not alter the fact that the pension plans have not provided evidence that the pension plans *actually* owned the stocks claimed. Therefore, the Danish Tax Agency is also not prevented from revoking/cancelling the reimbursement decisions as a consequence, see *e.g.,* UfR 2003.2312/3H and UfR 2007.3052 H.

The fact remains that there is no evidence that the pension plans actually owned the alleged stocks and received the alleged net proceeds, and therefore they were not entitled to the reimbursements paid.

## 8.    PENSION PLANS CONSIDERATIONS

### 8.1    Pension plans' money machine

The pension plans have stated in (...), that

> "*the elimination of financial risks [...] is a standard routine for any DIV-Arb transaction*"

and that

> "*every Div-Arb transaction is profitable.*"

According to the pension plans, they have therefore been able to use an investment vehicle without any financial risk and which always pays off.

Indeed, the pension plans state in (...) that "*Div-Arb is a money-making machine.*"

No such (legal) money machine exists.

### 8.2    One stock can have several owners

According to the pension plans, "*a stock may have more than one owner,*" (...).

That's not true.

This would imply that the issuing company would have to distribute dividends to more than 100% of its stockholders. This is not the case. Any doubt as to who owns a stock does not of course imply that there are several owners of the same stock at the same time.

If there could be multiple owners of the same stock, it would also mean that more than 100% of stockholders could attend and vote at the company's AGM.

### 8.3        Short-selling means that there are more stocks on the market than issued by the company

Pension plans claim that short-selling typically results in *"more stocks being available on the market than were originally issued,"* (...).

That's not true.

No more stocks may be traded than issued by the company – not even by short-selling. The chain in short-selling can be set up as follows:

$$\text{Owner/stock lender} \rightarrow \text{stock borrower/short-seller} \rightarrow \text{short-buyer}$$

Short-selling must be *covered*. In other words, the stock borrower must have borrowed the stock before selling it to the short buyer, and this sale agreement must of course respect the terms of the stock borrower's loan agreement with the stock lender – otherwise there is a default. Thus, one cannot (legally) duplicate either the stock or the right to dividend distribution by short-selling.

### 8.4        1 dividend tax can lead to 2 reimbursements

The pension plans claim that their setup *"results in two parallel dividend mergers, even though the Treasury has received only one dividend tax payment from the company."* (...).

This is patently false.

The reimbursements are, of course, the *repayment of* an amount that has been withheld. The payment of 1 withholding tax cannot therefore lead to 2 (legitimate) reimbursements. This would cause enormous losses to the Treasury. Any doubt as to who owns a stock and is therefore entitled to dividends and reimbursements does not, of course, mean that the Treasury has to reimbursement more dividend tax than has been withheld. After all, the State does not have to bear the risk (or the cost) that a trade was unlawful.

### 8.5        The case is about law

Pension plans try to wrap their *"money machine" in* a variety of legal considerations.

Ownership cannot be achieved through legal considerations. Rather, whether the pension plans acquired the alleged stocks is a question of fact. And the fact is that the pension plans cannot provide any concrete evidence of having owned the stocks. It is particularly noteworthy that none of the more than 100 pension plans has provided so much as one page of their own accounts.

This case does not concern the clarification of a legal grey area for the ownership of stocks. The case is about fact. Therefore, the pension plans' considerations of *bona fide ownership* and beneficial ownership are not relevant.

The right to a reimbursement of withheld dividend tax depends on whether you have owned stocks and received net dividends from them. If no stocks have been traded or if there are fictitious stock trades, the pension plans have not owned the stocks and are therefore not entitled to a reimbursement. This goes without saying. And it is irrelevant whether the pension plans were acting in good faith. *Ex tuto*, it should be noted that it is the Danish Tax Agency's view that the pension plans were acting in bad faith.

If these were *not* merely fictitious stock transactions, there would be firm and unequivocal evidence that the pension plans had purchased and owned the stocks and received the net proceeds therefrom.

### 8.6    It's impossible to cheat with stock trades

According to the pension plans, stock transactions are subject to such strict regulation that fictitious stock transactions cannot occur at all, (...). It is also – according to the pension plans – impossible for a custodian to issue documents without reality.

At the same time, however, the pension plans acknowledge that there are errors in (...) (custody statements and broker confirmations), which, according to the pension plans, *'appear to be due to simple human input errors in the computers'*, (...). In addition, some of the written trade notes from (...) (broker) contain *'deviations from the electronic instructions for settling the trade'*, (...).

These errors and anomalies illustrate the obvious fact that it *is* possible to cheat on stock trades if you have the will to do so.

Indeed, as this post shows, there are several clear errors in the material presented by the pension plans.

### 8.7    Alternate explanations 1: Pension plans' "conclusive" evidence changes character

The Pension Plans have previously claimed that the *Credit Advices* provided by the Shah-controlled custodians were "legal evidence" that the Pension Plans purchased the alleged stocks, (...). It is even stated in (...) – in general terms – that in addition to the Credit Advices

> *"there is no other evidence of receipt of a benefit."*

It is simply wrong that the pension plans – if they had actually received the alleged benefits – should not be able to provide any objective evidence of this.

Subsequently, the pension plans have taken the view that *the trade receipts* (...) are *"the decisive proof that the purchase of stocks has taken place,"* (...), since the presentation of a trade receipt is *"the only way of proving that one is the legal owner of stocks,"* (...).

Neither Credit Advices nor Trading Notes (...) document ownership of stocks. Credit Advices are just words on paper and trade notes do not prove that trades have actually been executed. In addition, the pension plans state in (...) that *'This allegation is materially incorrect. A broker confirmation is a trade note that can only be issued [...] when a trade has been <u>executed</u>."* (my emphasis).

Conversely, the pension plans state in (...) that *"the trading note from a broker [constitutes] evidence of a final and binding agreement to purchase stocks. As far as <u>settlement is concerned, the trade note from the broker does not prove that settlement has taken place."</u>* (my emphasis).

It is therefore agreed that the broker confirmations submitted (...) <u>do not</u> prove that the transaction has been carried out.

Pension plans have also previously argued that a custody statement has *"the same substantive value as supporting documentation as a bank statement."* (...). The pension plans have maintained that the custody statements provided (...) showed *daily* account movements, (...).

However, the custody statements provided (...) are only annual statements which – without underlying account statements – show a number of internal accounting entries at the custodian.

The (...) also states that the custody statements submitted (...) are merely *'account statements produced at the end of each year and therefore only show a summary of all transactions. Each transaction, be it a purchase, sale, forward hedge or stock loan, was entered in the custodian's systems on an ongoing basis and each trustee was able to view each transaction in the account on an ongoing basis through online access."*

The pension plans' comments further state that *"the trustee had online access via Solo's web portal to view and manage all transactions on a daily basis."*

It is also striking in this light that *none* of the pension plans provide statements of account of any kind. And it is remarkable that the pension plans now so radically change the explanation of the content of (...), which the pension plans in (...), referred to as *"legal evidence of ownership of stock positions."*

**8.8        Alternate explanations 2: Inconsistencies in explanations of guarantee and payment of reimbursement**

According to the pension plans, the GMSLAs involve a *"pledge of all assets (present and future),"* (...), the pension plans state that the financial result of the alleged stock transactions and forwards was *"pledged as security under the GMSLA."* No evidence of such pledging of the pension plans' assets to the GMSLA co-contractors has been provided.

Moreover, this pledge is not linked to the fact that the pension plans in (...), have indicated that the Div- Arb result (including net dividends and reimbursement) was pledged to the respective *custodian*. According to (...), the ownership rights to all the pension plans' funds was transferred to the custodian as security for the payment of the stock transactions under the TTC clause (point 4.3 of the Custody Agreement, (...)). This collateral has not been documented either.

The pension plans have in (...), changed the explanation that the ownership rights for the funds (including net-two dividends and reimbursement) was *always* transferred to *Solo Capital*. However, this is not consistent with the TTC clause in the Custody Agreement submitted (...), which refers to the "Custodian." It is – or at least has been so far – undisputed that Solo Capital is only one of 4 Shah-controlled custodians used by the pension plans represented by TVC Law Firm. It is obvious that this information from the pension plans is contradictory.

In addition, it is undisputed that the reimbursements were not paid to either the GMSLA co-contractors or the custodian (or Solo Capital), but to the pension plans' agents.

If the result is pledged, it does not make sense that the reimbursements are paid to the pension plan agents instead of to the pledgee.

**8.9        Alternate explanations 3: Pension plans accounts**

The pension plans have stated at the office meetings that all their money was deposited in Solo Capital's account, (…), and that all the alleged stock transactions as well as the receipt of net dividends and reimbursement were made through this account, (…). No evidence of this has been provided. It is also contrary to the pension plans' earlier statement that the pension plans did not need separate accounts in addition to the account with their respective custodian (which in far from all cases was Solo Capital), (…).

If the pension plans' money was in Solo Capital's account, it also seems odd that custody statements – which the pension plans themselves compare to bank statements, (…) – prepared by West Point, Telesto and Old Park Lane are widely available.

In any event, none of the pension plans provided any account statements at all.

**8.10        Alternate explanations 4: Lack of evidence**

It is stated in (…) – in general terms – that in addition to Credit Advices

*"there is no other evidence of receipt of a benefit."*

It is simply wrong that the pension plans – if they had actually received the alleged dividends – should not be able to provide any kind of objective evidence of this, *e.g.,* in the form of a dividend note, account statement, fund/deposit statement or similar, cf. the Supporting Document, § 2.2, on the examples of evidence now available on the Danish Tax Agency website.

**8.11        Lack of connection to VP Securities and settlement netting**

The pension plans state in many places in (…) that VP Securities does not have an accurate ownership register (…) and that stock trades are not necessarily executed by delivery of stocks between custodians, as trades are first settled by transfers of stocks internally (accounting-wise) at each custodian (…).

Such pleas cannot lead to the pension plans' complaint being upheld. Data from VP Securities must be taken into account in the assessment of evidence. It is therefore relevant whether the pension plans or their custodians held deposits in VP Securities – or whether they can show through which sub-custodians they allegedly held stocks.

It is the pension plans that must prove that they have owned stocks in Danish companies at the time of distribution, cf. § 7.1, above. If pension plans cannot prove ownership, they are not entitled to dividend distribution.

Through contact with VP Securities, the Danish Tax Agency has attempted to confirm whether the custodians listed by the pension plans have held stockholdings. VP Securities was unable to confirm this. The purpose of the Danish Tax Agency's contact with VP Securities was to clarify the cases. This does not alter the fact that the pension plans have the burden of proving ownership.

The same applies to netting procedures. There is no evidence that pension plan custodians have held stocks in Danish companies at any time. Where the Shah-related custodians (Solo Capital, Telesto, West Point and Old Park Lane) do not hold any stocks prior to delivery, they

of course receive stocks upon execution of the pension plans' "trades." It is up to the pension plans to prove that such delivery of stocks has occurred. The burden of proof cannot, of course, be discharged by reference to general considerations of netting.

The pension plans apparently claim that it is *impossible* to prove ownership of Danish stocks. This is of course not true.

**8.12**     **Stock borrower will provide collateral at market value**

As regards the alleged collateral provided by the stock borrower, the pension plans claim that

> *"However, it is customary in the stock lending industry to value the collateral to be provided mark-to-market (i.e., on a market basis) without any haircut. The main risk for the lender in a stock lending transaction is default by the borrower. It is therefore important that the value of the collateral (at least) corresponds to the market price (mark-to-market)."* (...)

This is not consistent with the fact that the collateral was *not the* market price at the time of the conclusion of the specific stock lending agreement, but rather the market price at the time of the conclusion of the purchase agreement, see § 3.2.2 above.

By extension, the pension plans refer to Nordnet requiring *more than* 100% of the market value in collateral.

Pension plans, however, distort the facts.

Nordnet is a large and established player in the market, with assets worth €92 billion according to its 2018 annual report. SEK, a gross profit of 1.3 billion SEK. SEK and equity of approximately SEK 2 billion. SEK.

The clipping from Nordnet (...) shows that a capital-intensive party, Nordnet, demands more than 100% collateral for shorting, so that Nordnet is sure to get the lent stocks back – and otherwise the collateral is high enough to make cover purchases.

Unlike Nordnet, the pension plans have neither equity nor assets. Consequently, it is the counterparty – namely the stock borrower, who must be capital strong and provide a me- sure significant amount of millions – who will be concerned about whether he will get his money back. And therefore, it is *very* unlikely that the borrower will agree to provide 100% security.

The example of Nordnet shows that the strong party will demand a "margin" in the security position in its favor.

The pension plans' invocation of the Nordnet example illustrates once again that the pension plans are invoking facts and evidence that are completely beside their situation. And it underlines how bad a case they have.

**8.13**     **Speculation as to whether Pinsent Masons has advised Solo Capital**

The pension plans refer to the fact that Pinsent Masons advised Solo Group in connection with the transactions carried out (...). However, this is undocumented and does not appear from the invoice and e-mail correspondence submitted (...), which do not concern advice relevant to the cases pending before the Danish Tax Appeals Agency.

In addition, any advice or opinion given by Pinsent Masons is, of course, irrelevant to the assessment of whether the pension schemes have owned stocks. This is true whether or not Pinsent Masons represents the Inland Revenue in England.

The pension plans' emphasis on this fact only looks like an attempt to muddy the picture.

What is most interesting about the pension plans' presentation of (...) is where the pension plans got the part of (...) that relates to advising Sanjay Shah and his companies. The pension plans' possession of (...) in its entirety suggests that the pension plans have contact with Sanjay Shah."

**Supporting document from the Danish Tax Agency dated August 09, 2019:**

"The Danish Tax Agency's <u>Supporting Appendix</u>

Table of contents

| | | |
|---|---|---|
| 1. | ACTORS | 2 |
| 1.1 | Custodian | 2 |
| 1.2 | Agents | 3 |
| 1.3 | U.S. pension plans | 4 |
| 1.4 | Brokers | 6 |
| 2. | REIMBURSEMENT APPLICATIONS | 7 |
| 2.1 | Period 2012-2015 | 7 |
| 2.1.1 | Forms | 8 |
| 2.1.2 | Credit Advice | 8 |
| 2.1.3 | Form 6166 | 8 |
| 2.1.4 | Power Attorney | 9 |
| 2.2 | New application process from 2017 onwards | 9 |
| 3. | TYPES OF CONTRACT | 9 |
| 3.1 | Global Master Securities Lending Agreement (GMSLA) | 9 |
| 3.2 | Forwards | 10 |
| 4. | CIVIL ACTION | 11 |
| 4.1.1 | Germany: Arrest of around 2.2 billion euros | 11 |
| 4.1.2 | USA: Litigation worth some €5.4 billion brought – and not dismissed | 12 |
| 4.1.3 | Settlement: repayment of DKK 10 million and DKK1.6 billion respectively | 13 |
| 5. | TREASURY DATA ANALYSIS | 13 |
| 5.1.1 | The basis of the Danish Tax Agency's analysis | 14 |
| 5.1.2 | The result of the analysis | 16 |

(...)

**1.    ACTORS**

The complex of cases relating to the reimbursement of dividend tax concerns a total of 306 pension plans and companies from various foreign jurisdictions that, through agents, have *unjustifiably* requested the Danish Tax Agency to reimburse dividend tax totaling approximately DKK 12.7 billion in the period from 2012 to 2015 inclusive. On the basis of the reimbursement requests, the Danish Tax Agency has paid the requested amounts in total approximately 12.7 billion

in the corresponding period. Payments were made to foreign bank accounts designated by – and belonging to – the agents.

Of the total of 306 pension plans and companies that have asked the Danish Tax Agency for dividend tax reimbursements, 277 pension plans are domiciled in the United States.

The various key actors and documents can be illustrated as follows:



### 1.1 Custodian

Generally, a custodian is a financial institution that holds clients' stocks and other securities.

The Credit Advices submitted in the case, which alone constitute the alleged "proof" of ownership of the stocks and receipt of dividends, have been produced by 12 different international custodian firms, listed below.

The distribution of the claim amounts for which each custodian has provided claimed "evidence" (Credit Advices) can be calculated as follows (in proportion to the 12.7 billion DKK *unduly* paid):

| Custodian | Total (DKK) |
|---|---|
| Solo Capital Partners LLP | 5,442,113,750 |
| Old Park Lane Capital PLC | 1,776,763,390 |
| (...) | 1,135,775,342 |
| Telesto Markets LLP | 925,443,359 |
| (...) | 920,721,387 |
| West Point Derivatives Ltd | 880,884,044 |
| (...) | 688,383,335 |
| (...) | 582,830,675 |
| (...) | 320,758,845 |
| (...) | 33,748,380 |

| | |
|---|---|
| (...) | 1,863,000 |
| (...) | 810,000 |
| Grand total | 12,710,095.50 |

The custodians involved are all domiciled in England except for (...) and (...), which are domiciled in (...) and (...) respectively.

**1.2 Agents**

All 306 pension plans and companies in the case applied for dividend tax reimbursements via a form system regulated by the Danish Tax Agency. The 306 entities used six international external advisory firms, so-called "agents," which forwarded the requesting entities' application for reimbursement of withheld dividend tax to the Danish Tax Agency.

The distribution of reimbursement requests between the six agents has been as follows:

| Agent | Paid (DKK) |
|---|---|
| (...) | 4,549,985,549 |
| (...) | 3,610,468,065 |
| (...) | 3,043,663,066 |
| (...) | 1,220,975,179 |
| (...) | 262,207,548 |
| (...) | 22,796,100 |
| Grand total | 12,710,095,507 |

(...) has played the largest role as an agent in the complex, having been involved in making requests for reimbursement of dividend tax for approximately DKK 4.5 billion out of the DKK 12.7 billion defrauded.

(...) is domiciled in England, as are (...), (...) and (...). The agents (...) and (...) are established in (...) and (...) respectively.

The agents were responsible not only for the dissemination of material but also for direct communication with the Danish Tax Agency and for sending the documentation for the reimbursement applications.

In their requests to the Danish Tax Agency, the agents indicated, on behalf of the 306 pension plans and companies, the foreign bank accounts to which they wanted the reimbursement amounts transferred. All the bank accounts indicated by the agents were accounts of the agents and the Danish Tax Agency, on the basis of a review of the requests, paid all the amounts relating to the requests into the bank accounts indicated by the agents.

**1.3 U.S. pension plans**

The vast majority of the 277 U.S. pension plans have been "401(k) plans," according to the information provided to the Danish Tax Agency. The designation refers to the fact that the pension plans have been established under the terms of § 401(a) of the U.S. Internal Revenue Code ("IRC").

A 401(k) plan is established by an employer for the benefit of its employees. It is a prerequisite for setting up a pension plan that the employer has an Employer Identification Number (ENI), which is assigned by the U.S. tax authorities, the IRS. Furthermore, it is a condition for the creation of 401(k) plans that there is a formally adopted *plan document* and that there is a separate agreement with a trustee. The *plan document* must govern the terms of the retirement plan, including compliance with the IRC and, if applicable, the Employee Retirement Income Security Act ("ERISA"), as well as other applicable laws. The agreement with the trustee shall govern how the plan assets are invested and managed.

Contributions to 401(k) plans can be made by both employees and the employer according to the retirement plan's *plan document* and the limits set by the IRC. Except for exceptions regarding the accrual of contributions at year-end changes, contributions to a 401(k) plan for each participant (both employer and employees) cannot exceed the lesser of 1) an amount limit that is periodically adjusted for inflation ($53,000 in 2016 or $59,000 for participants age 55 or older) and 2) 100% of the participant's compensation from the employer that year. The amount limit is lower for certain types of 401(k) plans.

Generally, 401(k) plans can only make distributions to participants or to cover allowable expenses of the pension plan. Distributions to participants can only be made under certain circumstances, such as termination of employment, financial hardship, death, disability, age (59½) or termination of the pension plan without succession. Such distributions must be reported to the IRS on Form 1099-R. It should be noted that other forms may be required if the distribution is made to a non-resident of the United States.

Contributions to 401(k) plans must be held in a separate fund managed by one or more trustees who, with certain exceptions, have the exclusive right to manage the pension assets, including the right to invest the funds.

In the present case, the trustees concerned have acted as trustees of the pension plans at a general level. The Trustee has signed powers of attorney on behalf of the pension plan *and* on behalf of the employer that established the plan. There are about 70 different trustees involved in the complex of cases. The vast majority are based in the United States. Of the 70 trustees, 4 trustees represent a total of 156 of the 277 U.S. pension plans.

The vast majority of the 401(k) plans involved in the case are of the "One-participant plans" type, as is also evident from the Danish Tax Agency's revocation decisions where this is the case. "One-participant plans are pension plans for business owners who do not have employees in the associated business (except for the owner's spouse, if any). These pension plans are thus, as the wording suggests, composed solely of the owner (and possibly his/her spouse). The pension plan is otherwise subject to the same rules and requirements as other 401(k) plans, except ERISA.

"One-participant plans are not required to file financial information (Form 5500) with the U.S. authorities when they have assets of $250,000 or less at the end of the *fiscal year*.

If one-participant plans have assets in excess of $250,000, they are required to file financial statements (Form 5500) with the U.S. authorities. This obligation is normally fulfilled by filing a Form 5500-EZ, but may in some cases be fulfilled instead by using a Form 5500-SF.

Of the 277 pension plans in the case, the vast majority have not filed Form 5500. It must be assumed that the other pension plans have not had assets of more than
$250,000 at the end of their *plan year*.

401(k) plans offer a number of tax advantages in the United States. Thus, the employer is entitled to deduct contributions to the pension plan, the employee is tax-exempt for contributions to the pension plan, and the pension plan's funds/income are exempt from income taxation. In addition, in double tax treaties with the US, 401(k) plans are granted some tax advantages, including the right to a reimbursement of dividend tax on foreign stocks. When these benefits are claimed in other countries, the pension plan must prove that it is domiciled in the United States.

**1.4        Brokers**

Generally, a broker is a middleman between investors who want to buy and sell securities. The broker is typically paid a fee for his role.

The broker arranges for the matching of the buyer and seller and thus the conclusion of the purchase agreement (executing broker) and/or for the completion of the transaction (clearing broker), *i.e.,* the exchange of the parties' services.

The pension plans represented by the TVC Law Firm have allegedly used their custodian for the clearing (execution) of the trades (...). They have thus used only executing brokers.

This means that the broker has been responsible for finding a buyer/seller. After matching, the broker has issued a broker confirmation (...) setting out the terms of the trade.

However, these trade notes are flawed to an extent that they have no probative value in themselves in the relationship of two parties having found each other in a stock trade (Summary Statement, § 5.4). The use of executing brokers is therefore at most a part of Sanjay Shah's cover-up of the fraud.

In addition, executing brokers do not execute the trades (clearing) and therefore have no knowledge of whether the parties actually exchange services – and whether the parties actually held the stocks that are allegedly bought/sold.

**REIMBURSEMENT APPLICATIONS**

**2.1        Period 2012–2015**

From 2012 to 2015, the pension plans have requested the Danish Tax Agency to reimbursement withheld dividend tax, referring to double taxation agreements between Denmark and the country in which each pension plan was resident.

The reimbursement requests were submitted by a number of international agent companies via the form system. The agents acted on behalf of the pension plans.

The requests were accompanied by the following:

1.    Form 6.003 ENG – Claim to Relief from Danish Dividend Tax (§ 2.1.1, below),

2. Certificate issued by a custodian in the form of, for example, a "Credit Advice" for the ownership of the stocks in question and the receipt of dividends on the stocks (§ 2.1.2, below).
3. IRS Form 6166 (for the 277 U.S. pension plans) (§ 2.1.3, below); and
4. Power of Attorney from the Pension Plan (§ 2.1.4, below),

On the basis of the pension plans' requests, the Danish Tax Agency paid the amounts requested into the agents' accounts, provided that the appropriate documents were attached. The Danish Tax Agency did not actually process the payments.

In the cases where the Danish Tax Agency has decided in 2018 to revoke the previous decisions to reimbursement withheld dividend tax, it is the Danish Tax Agency's opinion that the submitted documents are invalid and that the reimbursement has been wrongly unpaid.

### 2.1.1        Forms

The claim forms shall specify, inter alia, the amount of the reimbursement sought by the agent – on behalf of the pension plan – and the amount to be paid to the agent's bank account. Furthermore, the agent declares that the pension plan is the beneficial owner of the stocks in question.

Requests submitted in the specific driver cases are discussed below in § 6.

### 2.1.2        Credit Advice

As the only "evidence" of the pension plans' claim for reimbursement of withheld dividend tax, the requests were accompanied by Credit Advices issued by various custodians. These Credit Advices have been issued and submitted as "evidence" that the pension plans have owned stocks in Danish C20 companies, that the pension plans have received dividends from these companies and that dividends received have been subject to withholding tax.

All Credit Advices issued by the Solo Group are provided with an ID number.

These Credit Advices show – apparently – which Danish stocks the pension plans owned, which dividends had been distributed to the pension plans, and which dividend taxes had been withheld in connection with the distributions.

However, in the cases where the Danish Tax Agency has decided in 2018 to revoke the previous decisions to reimbursement withheld dividend tax, it is the Danish Tax Agency's view that the Credit Advices submitted are without substance.

### 2.1.3        Form 6166

Form 6166 (Certification of U.S. Tax Residency) is a certificate issued by the United States Treasury Department as evidence that an individual or business is domiciled in the United States for U.S. tax purposes. The certificate is issued by the Treasury Department on the basis of the financial plan's filing of Form 8802 (Application for United States Residency Certification).

The information on Form 8802 is furnished under responsibility and is not verified by the Treasury Department in issuing Form 6166. All of the 277 U.S. 401(k) retirement plans at issue in this case have attached Form 6166 to their applications.

The Form 6166 certificate certifies that a legal entity is domiciled in the United States for U.S. tax purposes. It should be noted that the certificate does not document whether the other conditions for receiving a reimbursement of withholding tax on foreign stocks are met under a double tax treaty, including whether the applicant is the beneficial owner of the stocks on which the reimbursement is sought.

To meet the requirements to receive the certificate, the retirement plan must submit a copy of the signed Form 5500 or an IRS determination letter or a statement (made under penalty of law) as to why the retirement plan is not required to file Form 5500 and why the retirement plan does not have an IRS determination letter.

### 2.1.4    Power of Attorney

The Power of Attorney submitted authorizes the agent to apply on behalf of the pension plan, inter alia, for a reimbursement of withheld dividend tax and to receive reimbursement amounts from the Danish Tax Agency.

### 2.2    New application process from 2017 onwards

In early 2017, the Danish Tax Agency launched a new IT solution for reporting dividend tax reimbursement requests. The IT solution functions as "TastSelv," where the reimbursement request is uploaded with the corresponding documentation.

The Danish Tax Agency website states that it is a condition for dividend reimbursement that Danish dividend tax is withheld from the dividend for which reimbursement is sought ("condition 3") and that the stockholder is the legal owner of the stocks at the time of the adoption of the dividend ("condition 4"), (...).

According to the Danish Tax Agency's website, evidence of compliance with conditions 3 and 4 may include a dividend note or notification from the custodian bank of the dividend received, an account statement, a securities account statement showing, among other things, the stockholding at the time the dividend was declared and a purchase receipt, (...).

### 3.    TYPES OF AGREEMENT

### 3.1    Global Master Securities Lending Agreement (GMSLA)

A GMSLA is a standard for loan agreements developed by ISLA (The International Securities Lending Association). The standard agreement allows securities, such as stocks, to be lent across national borders.

The GMSLA contains a number of standard terms and conditions, and in addition there is various information that the parties must fill in specifically.

The GMSLA is thus a *framework agreement*. This means that the GMSLA sets the framework in terms of the stock lending. However, the GMSLA has no effect unless the parties *actually* enter into equity loan agreements, in which case the terms of the GMSLA will apply.

The pension plans have submitted a number of GMSLAs as (...) in the respective cases. The GMSLAs submitted are in many cases not signed by (all) parties to the agreement.

**3.2        Forwards**

A forward is a forward contract. It can be a binding agreement for the future delivery of a currency or commodity at a pre-agreed date and price. The forward contract thus constitutes a hedge against the time of future delivery, since the parties to the contract know in advance at what price the commodity/currency will be traded.

The pre-shipment agreement *need* not be tied to physical delivery of the asset, but can also be settled by *difference settlement*. This means that at the end of the forward contract, instead of delivering the currency/asset (*e.g.,* a stock), the parties settle the difference between the market price and the price agreed in the forward contract.

In the case of netting, it is not necessary for the parties to actually hold the asset to which the forward contract is linked, as the asset does not have to be delivered, but is only used to establish a payment obligation.

Example
A and B enter into a forward on August 1, 2019. The agreement is that on September 1, 2019 A will acquire B's Novo Nordisk stocks, which on August 1st have a market value of DKK 1 million, for DKK 1.01 million.

On September 1, 2019, the agreement will be settled. For example, the market value of the stock is assumed to have increased to DKK 1.2 million.

The settlement can then *either* be made by A buying the stockholding from B for DKK 1,01 million. *Or* the settlement can be made by difference settlement:

The parties had agreed to trade the stock for DKK 1.01 million, but the stock has a value of DKK 1.2 million (the market price, also called the spot price). The stock is therefore worth DKK 190,000 more than the price agreed by the parties. B must then pay A DKK 190,000, which is the difference between the agreed price and the market price on the expiry date.

**4.        CIVIL LEGAL ACTION**

The tax authorities have taken a number of civil actions in several jurisdictions, including the US, Germany and the UK. The aim is to recover financial losses incurred by the State amounting to more than DKK 12.7 billion, which were wrongly paid into the accounts designated by the agents. The Tax Agency has thus brought both recovery and compensation claims against a number of different actors in the case in order to establish their respective payment obligations.

In particular, all the pension plans represented by TVC Law Firm have been sued in the United States for payment.

No final decisions on the merits of the case have yet been taken.

However, there are a number of cases where foreign courts have ruled on (parts of) the complex of cases and where the decisions are not subject to confidentiality:

### 4.1.1 Germany: Arrest for approximately DKK 2.2 billion

In June 2018, civil seizures and arrests were carried out in various jurisdictions, including Germany. In connection with the arrests, the Danish Tax Agency described and provided evidence of the alleged fraud in the case.

To be successful in an application for arrest in Germany, three conditions must be met:

5. there must be a legal basis for the claim against the owners,
6. there must be a preponderant probability that the assets in question actually belong to funds disbursed by the Danish Tax Agency; and
7. there must be a risk that the assets will be moved or lose their value to the detriment of the Danish Tax Agency if the arrest is not carried out.

The Tax Agency has carried out arrests in Germany for approximately DKK 2.2 billion.

### 4.1.2 USA: Lawsuits worth around €5.4 billion filed – and not dismissed

In the U.S., the Danish Tax Agency has retained a U.S. law firm to advise on the possibility of pursuing the Danish Tax Agency's recovery and damages claims in the U.S. against the U.S. pension plans involved. A total of 155 lawsuits have been filed in a number of U.S. courts, primarily in New York, in the period up to June 15, 2018 against pension plans, management members and trustees of these pension plans and, in some cases, third parties related to the pension plans and the applications. In total, litigation has been brought for approximately DKK 5.4 billion.

All pension plans represented by TVC Law Firm have been subpoenaed.

The first hearing in a series of the lawsuits was held on June 26, 2018 in New York.

The pension plans filed a motion to dismiss the cases with the Court of the Southern District of New York. The pension plans argued, inter alia, that the court did not have jurisdiction because, according to the pension plans, the Danish Tax Agency's claims were governed by the common law doctrine of the revenue rule, which provides that U.S. courts do not have jurisdiction over cases directly or indirectly seeking enforcement of foreign tax laws. In other words, the rule means that foreign tax authorities cannot bring claims that can be directly or indirectly characterized as tax claims before U.S. courts.

On January 9, 2019, the Court dismissed the pension plans' application for a declaration of inadmissibility in its entirety (...). It follows, inter alia, from the order of the Court (...) that

> *"If plaintiff can prove that the defendants never in fact owned the relevant Danish stocks – and the Court is obliged to accept their allegations as true for present purposes – the revenue rule would not apply because the substance of the claims would be for garden variety commercial fraud. Accordingly, the motion to dismiss is denied."*

In this regard, the Court of First Instance emphasizes, among other things, that in its summons the Danish Tax Agency has alleged that there is fraud ("*commercial fraud*") (...), and that a position on the case does not require an interpretation of the concept of "*beneficial ownership*" in Danish tax law. The tax authorities have thus (without distinguishing between beneficial and beneficial ownership) claimed that the pension plans have not owned the stocks and the pension plans have not provided any evidence to the contrary (...).

***4.1.3    Settlement: repayment of DKK 10 million and DKK 1.6 billion respectively***

The IRS has reached two settlements with a total of 63 U.S. pension plans and related individuals and companies:

In the fall of 2018, the Danish Tax Agency settled with 2 U.S. pension plans. The two pension plans had previously filed complaints with the Danish Tax Appeals Agency and were represented by TVC Law Firm during the complaints. When the cases were settled in autumn 2018, the complaints were withdrawn. The settlements implied that the two pension plans repaid the reimbursement amounts, see the press release of the Ministry of Taxation of November 1, 2018 (...) and the press release of May 29, 2019 (...).

In May 2019, the Danish Tax Agency reached a new settlement agreement. The new settlement agreement was reached with 61 American pension plans and a number of related persons and companies. The 61 pension plans had received approximately DKK 2.9 billion in the period 2012–2015. Of this, the pension plans themselves had received approximately DKK 1.6 billion. The settlement was that the pension plans and their associated persons and companies would repay approximately DKK 1.6 billion. The Tax Agency is still pursuing the remainder with other responsible parties (...).

So far, 63 U.S. pension plans have settled the case, covering more than a fifth of the total suspected fraud.

## 5.    DANISH TAX AGENCY DATA ANALYSIS

The Danish Tax Agency has reviewed the reimbursement requests submitted and compared these with the Danish C20 companies' distributions, stock capital, etc. On this basis, the Danish Tax Agency has carried out an overall analysis of whether the reimbursement requests *may* be correct overall.

The analysis resulted in two partial conclusions, which are discussed in more detail below:

   too much was reimbursed in relation to what was withheld
   In some cases, *more than* the amount of dividend tax withheld has been reimbursed. This suggests that (part of) the reimbursement requests are fraudulent, as the reimbursement cannot exceed the amount withheld.

   Reimbursement claims based on unlikely large investments in and ownership of Danish companies

   It is *quite unlikely* that very significant stocks of Danish C20 companies would be owned by unknown pension plans etc., which often have only one owner and which have at most a very modest capital base.

The partial conclusions of the analysis show that there has been significant fraud.

***5.1.1    Basis for the Danish Tax Agency's analysis***

The Danish Tax Agency has analyzed a number of distributions from selected Danish companies where the pension plans etc. have subsequently applied for a reimbursement of alleged withheld dividend tax. The Danish Tax Agency's analysis has concentrated on the distributions where the largest proceeds have accrued to the pension plans, etc., and where SØIK has obtained material from VP Securities. The analysis has thus covered approximately DKK 12.4 billion out of the total fraud of DKK 12.7 billion.

### 5.1.1.1    The legal basis

When companies distribute dividends, they are generally required to withhold 27% dividend tax on all dividends. However, withholding may be applied at, for example, 0% or 15% instead, depending on the circumstances and information about the recipient of the dividend, cf. §§ 65-67 A of the Withholding Tax Act.

Withholding at rates other than 27 % indicates that the taxpayer is covered by an exemption provision, see for example § 65(11) of the Withholding Tax Act and § 31(1)(2) of the Withholding Tax Order. In such cases, no (legitimate) claim for reimbursement of dividend tax can be made under double taxation conventions, as the recipient of the dividend does not meet the requirements of the exemption provisions if he is a foreigner under tax law. It is therefore only when 27% dividend tax is withheld that a reimbursement can be claimed.

In addition, the requests must be supported by a double taxation agreement. It is therefore a requirement that the applicant is not resident in Denmark, in which case the person would not be covered by a double taxation agreement.

A reimbursement of dividend tax can thus only (legitimately) be claimed if the withholding tax has been withheld at the rate of 27% from a (tax) foreigner.

### 5.1.1.2    The facts

For Danish listed companies, VP Securities registers the taxation to be paid to each of the registered owners when dividends are distributed. VP Securities also handles the actual distribution. VP Securities then informs the company of the distributions, inter alia so that the company can fulfil its obligation to provide information to the Danish Tax Agency.

Indeed, companies are obliged to declare to the Danish Tax Agency what has been distributed in total and what has been withheld in dividend tax at each of the given percentages (inter alia 15% and 27%). On this basis, the Danish Tax Agency is aware of (...):

> Amount distributed
> Withholding tax – both total and broken down by respective percentage

The Danish Tax Agency also has information on all reimbursement requests, as these have been sent to the Danish Tax Agency (...). The information has been recorded in the IT system 3S for applications under the blanket scheme.

When the Danish Tax Agency became aware that reimbursement requests for dividend tax might have been fraudulent, the Danish Tax Agency manually made a calculation of the total amount of reimbursement requested for each distribution. In addition, the Danish Tax Agency manually calculated how much the pension plans, etc. had claimed per distribution. The Danish Tax Agency thus currently has knowledge of the total:

> Total reimbursement requests for each distribution (...) Reimbursement requests from pension plans, etc. for each distribution (...)

In addition, the Danish Tax Agency has received additional information from VP Securities, which SØIK has obtained. This information has been extracted directly from VP Securities' records relating to a number of specific distributions. This includes the total number of stocks (in each stock class) outstanding at the time of the distribution and the name and address of each registered owner at the time of the distribution.

The ownership information recorded in VP Securities is not complete. A significant proportion of the stocks of listed companies are recorded as being owned by, for example, banks that have a single securities account for their customers (called an omnibus securities account). Here the bank is registered as the owner with VP Securities, even though it is a client who actually owns the stockholding. Omnibus securities accounts are registered with the nationality/address of the securities account holder (typically the bank) – without knowledge of the nationality of the underlying owner. In addition, addresses registered in VP Securities may not have been updated when the stockholder moved.

The Danish Tax Agency has used the address information from VP Securities to determine whether the owner (for tax purposes) is a foreigner (...). Given that a very significant proportion of Danish C20 stocks are held in omnibus deposits, the proportion of foreign stockholders _may_ be different from what appears from VP Securities' records. Nevertheless, the statement gives an indication of the proportion of stocks held by residents of countries other than Denmark.

On the basis of the companies' reports and the data obtained from VP Securities, the Danish Tax Agency has obtained knowledge of (...):

>          Total number of stocks outstanding at dividend date
>          Percentage of stocks registered as owned by foreigners on the date of dividend

Finally, the Danish Tax Agency has collected a number of publicly available information on, among other things, stock prices and dividends per stock.

### 5.1.2      The result of the analysis

#### 5.1.2.1     _Excessive reimbursement in relation to what is withheld._

The Danish Tax Agency has compared the reimbursement requests with the withheld dividend tax for the distributions in the period 2012–2015 from Danish C20 companies where there has been the most extensive fraud with reimbursement requests (...). Thus, not all distributions have been included in the analysis, but rather a number of selected distributions.

The analysis has shown that across the distributions analyzed, 76.9% of the amount withheld has been paid out as a dividend reimbursement.

Looking at the individual distributions separately, it appears that in 11 cases _more was reimbursed than was withheld_ (...) and that fraud accounted for a very large proportion of the reimbursement requests. In three cases, _the pension plans etc. alone_ were reimbursed more than the amount withheld.

When more is reimbursed than is withheld, it goes without saying that some of the reimbursement requests have been unjustified. There can be no claim to "reimburse" something that has never been withheld.

-------

The Danish Tax Agency then carried out an even more in-depth analysis (...). As discussed, dividend reimbursements are only available if dividend tax is withheld at the rate of 27% _and_ the dividend recipient is a foreigner (for tax purposes).

The analysis shows that 91.7 % of the dividend withheld at the rate of 27% has been reimbursed. When taking into account _that_ not all stocks with a dividend tax rate of 27% are owned by foreigners,

*that* far from all foreigners are eligible for reimbursement at all and *that* many foreigners will be eligible for partial reimbursement at most, it is clear that (part of) the reimbursement requests have been unjustified.

This is particularly true for the individual distributions. In 14 cases, *more than the dividend* withholding *tax* contained in the records of VP Securities *at the rate of 27 %* was *reimbursed* (...). This is *not* (legally) possible.

Furthermore, in 23 cases, *more than* the *dividend tax* withheld *from foreigners at the rate of 27%* according to VP Securities' records was *reimbursed* (...).

### 5.1.2.2    Reimbursement requests reflect unlikely investments and ownership

The Danish Tax Agency has also compared the information on the number of stocks at the time of the dividend with the official stock prices on that date (...). In this way it has been possible to calculate the total investment for the pension plans etc. in each C20 company at the time of the distribution.

As can be seen, the total investment for the pension plans etc. has been around DKK 910 billion during March 2015.

However, given the different distribution dates of the different companies, the investments have not necessarily been simultaneous, even if they are within the same month. For example, just on March 19, 2015, investments amounted to DKK 445 billion in Novo Nordisk (B) and DKK 13.2 billion in GN Store Nord, for a total of DKK 458.2 billion.

Finally, the Danish Tax Agency compared the number of stocks requested with the total stock capital of the companies (...). From this, it was calculated what proportion of the companies' total stock capital should have been held by the pension plans, etc. This has been compared with the proportion of company stocks available for such investment.

As can be seen, the pension plans etc. would have owned, inter alia, 51.4% of the A.P. Møller stocks in 2014, 59.5% of the Novo Nordisk B stocks in 2014 and 66.9% of the FL Smidth & Co. stocks in 2015.

Overall, it is *quite unlikely* that stockholders/players unknown on the Danish market would have made *such large* investments and hold such significant stocks. The figures thus support the view that a large proportion of reimbursement requests must be unjustified.

In particular, in relation to the A.P. Møller stocks, it is noted that four known major Danish stockholders together owned 52.82% of the stock capital in 2014 (...), making it *impossible* for the pension plans etc. to own 51.4%.

(...)"

**The appellant's summary statement**
The appellant's summary and closing submissions are as follows:

"As you know, the Danish Tax Appeals Agency has recommended, in a proposal for a decision dated July 3, 2019 in the six leading cases, that the Danish Tax Agency's decisions of April 6, 2018 and May 4, 2018 be upheld.

Since the purpose of the leading cases is to form the basis for the other cases represented by TVC and SMK, it must be assumed that the Danish Tax Appeals Agency will argue in the same way in this case.

On the other hand, the pension plan maintains in general terms that the Danish Tax Agency is not entitled to annul the original decisions on the payment of dividend reimbursements.

Thus, the Pension Plan maintains generally that the Pension Plan was entitled to receive the dividend distributions at issue in the cases, including that the Pension Plan owned the stock and dividend amounts at issue in the cases.

The Danish Tax Appeals Agency's proposed decision of July 3, 2019 in the six leading cases and the Danish Tax Agency's summary of August 9, 2019 give the Pension Plan cause to submit the present summary.

It is a feature of the present case that the pension plan has provided a very extensive supporting documentary evidence of the disputed transactions and the pension plans' ownership of the disputed stocks and dividends.

It is also a feature of the case that the Danish Tax Agency bases its views on assumptions made several years after the Danish Tax Agency decision on the disputed dividend tax reimbursements, and that the doubts which the Danish Tax Agency has sought to raise are to a large extent attributable to the Danish Tax Agency's own inadequate information on the case.

... ...

The pension plan maintains, as stated, that it was both the civil and tax owner of the stocks at issue and that the pension plan was entitled to receive the dividends at issue, with the effect that the pension plan was entitled to receive a reimbursement of the withheld dividend tax.

It is therefore maintained that there are now no grounds for revoking or annulling the Danish Tax Agency's original decision on the reimbursement of withheld dividend tax.

In this summary, we will provide our comments on the Danish Tax Appeals Agency's proposed decision of July 3, 2019 in the lead cases. In addition, we will discuss the views expressed by the Danish Tax Agency in its summary submission of August 9, 2019 in the lead cases.

For the sake of clarity, we have also chosen to incorporate the above in subsequent posts, so that the present post serves as a summary post.

In the first part of this paper, we describe in detail the investment strategy followed by the pension plan and the related dispositions.

In doing so, we will explain why the pension plan both civilly and fiscally owned the disputed stocks and dividends.

In the second part of this submission, we will comment on the Danish Tax Agency's views in the case, in particular the Danish Tax Agency's views in relation to the documentation and content of the disputed transactions.

In addition, we will comment on the documentation requirements set by the Danish Tax Appeals Agency, as well as the Danish Tax Agency's own lack of information.

In the third part of this submission, we will present our comments on the Danish Tax Appeals Agency's proposed decision of July 3, 2019 in the lead cases, including the points made by the Danish Tax Appeals Agency in relation to the documentation of the transactions in question and their substance.

1.INTRODUCTION----------------------------------------------------------------------------------------------------------------8
PART 1: THE PENSION PLAN WAS THE BENEFICIAL OWNER OF STOCKS AND DIVIDENDS FOR TAX PURPOSES
2 DESCRIPTION OF FINANCIAL OPERATIONS AND RELEVANT EXTERNAL ACTORS---------------------------------9
2.1       About the pension plan that acquired Danish stocks --------------------------------------------------9
2.1.1     Dispositions on behalf of the pension plan-----------------------------------------------------------11
2.2       Financial instruments used --------------------------------------------------------------------------------12
2.2.1     Stock purchase/sale --------------------------------------------------------------------------------------13
2.2.2     Forwards ------------------------------------------------------------------------------------------------------14
2.2.3     Stock lending--------------------------------------------------------------------------------------------------14
2.3       The external actors involved ------------------------------------------------------------------------------16
2.3.1     Brokers ---------------------------------------------------------------------------------------------------------16
2.3.2     Stock Loan Intermediaries --------------------------------------------------------------------------------18
2.3.3     Forward counterparties and intermediaries ----------------------------------------------------------19
2.3.4     Custodians and clearing agents --------------------------------------------------------------------------20
2.3.5     Tax agents ----------------------------------------------------------------------------------------------------23
2.3.6     Introducing brokers ----------------------------------------------------------------------------------------24
2.3.7     Arrangers -----------------------------------------------------------------------------------------------------24
2.3.8     Summary remarks on the external actors involved --------------------------------------------------24
2.4       Pension Plan Business Model and Operations---------------------------------------------------------25
2.4.1     Introduction to dividend arbitrage ---------------------------------------------------------------------25
2.4.2     Transactions --------------------------------------------------------------------------------------------------27
2.4.2.1   Onboarding --------------------------------------------------------------------------------------------------27
2.4.2.2   Purchase of stocks and sale of forwards ---------------------------------------------------------------27
2.4.2.2.1 Procedure for buying and selling forward -------------------------------------------------------------27
2.4.2.2.2 Business justification of the pension plan and the stock seller for stock purchase/sale -----29
2.4.2.2.3 Business rationale of the pension plan and the forward purchaser for sale/purchase of forward --------------------------31
2.4.2.3   Stock lending and financing of stock purchases ------------------------------------------------------32
2.4.2.3.1 Stock lending procedure ----------------------------------------------------------------------------------32
2.4.2.3.2 Business justification of the pension plan and the stock borrower for stock lending-----------33
2.4.2.3.3 Other comments on the financing of stock purchases ---------------------------------------------34
2.4.2.4   Settlement of transactions -------------------------------------------------------------------------------35
2.4.2.6   Positions are closed ---------------------------------------------------------------------------------------38
2.4.2.7   Profit realized-----------------------------------------------------------------------------------------------38
2.4.2.8   Summary comments on the business model and transactions-------------------------------------39

2.4.2.9    Examples of dividend arbitrage transactions ------------------------------------------------------43
        3. THE PENSION PLAN BECAME THE CIVIL AND TAX LAWFUL
        OWNER OF THE STOCKS -----------------------------------------------------------------------------**46**
3.1     The pension plan became the civil law owner of the stocks ------------------------------------46
3.2     Trading in large stocks – short selling ---------------------------------------------------------48
3.2.1   Introduction to short selling ---------------------------------------------------------------------49
3.2.2   Short selling creates more stocks until the trades are settled --------------------------------52
3.2.2.1 The Tax Agency's views on the "short buyer" -----------------------------------------------55
3.2.2.2 Impact of multiple stocks due to short selling (until settlement) ------------------------57
3.2.2.1 Missing withholding tax on compensation payments ---------------------------------------58
3.2.2.3 Fiscal beneficial ownership in stock lending – dual ownership in addition to settlement ------------------------60
3.2.2.3.1 Case law on beneficial ownership for tax purposes stock lending -----------------------61
3.2.2.3.2 Danish Tax Agency on tax ownership of stock lending -------------------------------------63
3.2.2.3.3 Ministry of Taxation on the beneficial ownership for tax purposes of stock lending ------------64
3.2.2.3.3.1 Stock lending without resale to third parties ---------------------------------------------64
3.2.2.3.2 Stock lending with resale to third parties----------------------------------------------------65
3.2.2.3.3 Comments on the view of the Ministry of Taxation ---------------------------------------65
3.2.2.3.4 The literature on beneficial ownership for tax purposes by stock lending -------------66
3.2.2.4  Conclusion: short selling has an impact on the tax beneficial ownership of the pension plan ------71
        4. LEGAL ASPECTS OF DIVIDEND TAX ------------------------------------------------------------**72**
4.1     Dividend tax is withheld according to the rules of the withholding tax law----------------73
4.2     Rules of the Withholding Tax Order on exemption from withholding tax -------------------73
4.3     Limited tax liability of dividends ---------------------------------------------------------------74
4.4     Determining the correct percentage ------------------------------------------------------------74
4.5     Compensation payments -------------------------------------------------------------------------74
        5. PROOF OF LEGAL OWNERSHIP FOR TAX PURPOSES -----------------------------------------**75**
5.1     The evidence available in practice for a tax law ownership -----------------------------------76
5.1.1   Broker confirmations ------------------------------------------------------------------------------76
5.1.2   Custody statements and DCA ------------------------------------------------------------------78
5.2     Evidence of beneficial ownership of the pension plan for tax purposes ---------------------79
        CONCLUSION OF THE FIRST PART -----------------------------------------------------------------**82**
        PART 2: THE TAX ADMINISTRATION'S VIEWS ARE BASED ON AN UNDOCUMENTED
        AND WRONG BASIS – NO BASIS FOR REVOCATION -----------------------------------------------**82**
        6. THE TAX AUTHORITIES' FAILURE TO PROVIDE INFORMATION-------------------------------**82**
        7. PRESENTED AND MISSING DOCUMENTATION ----------------------------------------------**84**
7.1     Tax Agency's unsubstantiated claim of false documentation ---------------------------------84
7.1.1   Errors in documentation from brokers ----------------------------------------------------------85
7.1.1.1 Different trade dates on broker confirmations and custody statements ------------------85
7.1.1.2 Commercial notes confuse buying and selling ------------------------------------------------87
7.1.1.3 Commercial note indicates price as "#####" -------------------------------------------------87
7.1.1.4 Commercial invoices do not take public holidays into account ---------------------------88

7.1.1.5    Errors in other commercial notes -------------------------------------------------------------------------------89
7.1.3      Compliance with the GMSLA---------------------------------------------------------------------------------------91
7.1.4      Stock lending rate----------------------------------------------------------------------------------------------------92
7.2        Lack of documentation ----------------------------------------------------------------------------------------------92
7.2.1      The contract of sale of the stocks -----------------------------------------------------------------------------93
7.2.2      Cash flow and bank statements -------------------------------------------------------------------------------93
7.2.2.1    Money flow -------------------------------------------------------------------------------------------------------------93
7.2.2.2    Flow of stocks ---------------------------------------------------------------------------------------------------------94
7.2.3      TTC clauses -----------------------------------------------------------------------------------------------------------94
7.2.4      Single account opening documents and transaction documents ------------------------------95
7.2.5      Documentation in 2014 and 2015 ----------------------------------------------------------------------------95
7.3        Responsibility for lack of documentation ---------------------------------------------------------------96
**8.**     **OVERPAYMENT OF DIVIDEND TAX** -------------------------------------------------------------------**97**
8.1        Sum of all reimbursements -----------------------------------------------------------------------------------97
8.2        Total reimbursements per distributing company --------------------------------------------------99
8.3        Error functions in dividend tax administration ------------------------------------------------100
**9.**     **PENSION PLAN FINANCIAL TRANSACTIONS** ------------------------------------------------**102**
9.1        Financing of stock purchases --------------------------------------------------------------------------------102
9.2        The possibility of carrying out the financial operations in question -----------------104
9.3        Registrations in VP Securities are of no significance -----------------------------------------108
9.3.1      Benefit of a registration with VP Securities ---------------------------------------------------------108
9.3.2      Documentation that the Solo Group has held stocks ---------------------------------------------109
9.3.3      Letters from SØIK and VP Securities -----------------------------------------------------------------110
9.4        The pension plan received dividends -----------------------------------------------------------------------112
9.5        Withholding tax was withheld in the pension plan dividend payment -----------------------113
9.6        The pension plan received the reimbursement -----------------------------------------------------------115
9.7        Security under custody agreement -------------------------------------------------------------------------116
9.8        "Fictitious transactions"--------------------------------------------------------------------------------------117
9.8.1      Definition of "fictitious transaction" ------------------------------------------------------------------118
9.8.1.1    Fictitious trade -----------------------------------------------------------------------------------------------------118
9.8.1.1    Purchase of short sellers ------------------------------------------------------------------------------------118
9.8.1.1.2  Delivery of stocks bought by short sellers -----------------------------------------------------------119
9.8.1.1.3  Adoption of dividends (market claim) -----------------------------------------------------------------119
9.8.1.2    Fictitious agreements -----------------------------------------------------------------------------------------119
9.8.2      Trading organized by Solo -----------------------------------------------------------------------------------120
9.8.3      Fictitious  stocks – short selling ----------------------------------------------------------------------------122
9.9        The Tax Agency's erroneous assumptions about the process -----------------------------------123
9.10       Stock purchases were completed -----------------------------------------------------------------------------124
9.11       Longer settlement period than VP Securities -----------------------------------------------------------126
9.12       Not just a desk-top exercise -----------------------------------------------------------------------------------128
9.12.1     All pension plans buy on the same day and at the same price ----------------------------------128
9.12. 2    The size of stockholdings ------------------------------------------------------------------------------------130
9.12.3     Nearly equal equity portfolios ------------------------------------------------------------------------------131
9.12.4     All pension plans have dealt with the same parties --------------------------------------------------132
9.12.5     Same time of sale -----------------------------------------------------------------------------------------------132
9.12.6     Sanjay Shah controlled the custodians of the pension plans (Solo Group) ------------------133
9.12.7     Shah's "Universe" -----------------------------------------------------------------------------------------------134
9.12.8     Consecutive numbering of Credit Advices across the Solo Group, which was also used in 2017 ---------------------135

9.12.9    Pension plans are not centrally managed---------------------------------------------136
9.12.10   Non-submitted claims for reimbursement --------------------------------------------137
9.13      One dividend tax can lead to two reimbursements ------------------------------------138
9.15      It's impossible to cheat on stock trades --------------------------------------------141
9.16      Pension plans do not change explanation --------------------------------------------142
9.16.1    Broker confirmations and custody statements ----------------------------------------142
9.16.2    Security ------------------------------------------------------------------------143
9.16.3    Pension scheme accounts --------------------------------------------------------144
9.16.4    Documentation for receipt of dividends ---------------------------------------------144
9.17      Pinsent Masons ----------------------------------------------------------------145
**10.**   **BURDEN OF PROOF AND FORMALITY-----------------------------------------------146**
          **CONCLUSION OF THE SECOND PART-----------------------------------------------149**
          **PART 3: THE TAX ADMINISTRATION'S POSITION IN THE LEAD CASES – THE**
          **COMPLETED TRADES HAD REALITY -----------------------------------------------150**
**11.**   **RECOGNITION OF THE IMPLEMENTATION OF THE STOCK DEALERS---------------------150**
**12.**   **THE TAX AUTHORITIES' DISREGARD OF TAX OWNERSHIP IN THE DRIVERS' CASES ---------151**
12.1      Knowledge of the Transaction Documents --------------------------------------------151
12.2      Documentation------------------------------------------------------------------151
12.2.1    Documentation for the ownership of the stocks----------------------------------------152
12.2.2    Documentation of receipt of proceeds------------------------------------------------153
12.2.3    Documentation for receipt of dividend reimbursement ---------------------------------155
12.3      No basis to contest the merits-----------------------------------------------------155
12.3.1    Civil law governs the assessment of tax ownership ------------------------------------156
12.3.2    General on the principle of reality-------------------------------------------------156
12.3.3    The principle of reasonableness in case law -----------------------------------------160
12.3.4    The principle of reality in the legal literature --------------------------------------180
12.3.5    The principle of reasonality applied to pension plan cases ---------------------------182
12.3.5.1  Documentation of the link to the pension plan's finances ----------------------------183
12.3.5.2  The reality principle – agreements with independent parties on market conditions ---------184
12.3.5.3  The principle of reality – acting effectively implemented on
12.3.5.4  Pension plans, including right of disposal -------------------------------------------184
12.3.5.4.1 Transfers from custodian --------------------------------------------------------184
12.3.5.4.2 Custodians' actions on behalf of pension plans --------------------------------------188
12.4      Otherwise, no basis for disregarding the tax ownership of the pension plan---------------188
12.4.1    Other documentation-------------------------------------------------------------189
          **Final conclusion----------------------------------------------------------------190**
          Text mark not defined
          **Appendix -------------------------------------------------------------------191**
          **Further development of the case ---------------------------------------------194**

## 1    INTRODUCTION

In this case, there is little agreement between the Danish Tax Agency and the appellant – with one exception: the subject matter of the case.

As the Danish Tax Agency rightly points out in the summary of the
August 9, 2019 in the lead cases, § 2, page 5, all these cases concern the question of whether the pension plans were eligible for a reimbursement of withheld dividend tax.

The cases are thus not, at their core, about formalities (revocation or cancellation) or about stock trading and the actors involved in a stock trade.

Contrary to the Danish Tax Agency's claim, the cases do not concern the financing of stock transactions or errors in documentation.

The cases in fact concern the question of how to become the legal owner of a Danish dematerialized stock, whether the pension plans have really received a dividend, short slinging, which results in more Danish stocks being in circulation than issued by the Danish companies, and shortcomings in Danish tax legislation, which results in underpayment of dividend tax.

All these questions are triggered by the investment strategy of dividend arbitrage, which found its way to the Danish market in earnest in 2012.

**PART 1: THE PENSION PLAN WAS THE BENEFICIAL OWNER OF STOCKS AND DIVIDENDS FOR TAX PURPOSES**

It is maintained that the pension plan was the civil and tax owner of the stocks at issue and the civil and tax owner of the dividends at issue.

The stocks were acquired through the implementation of dividend arbitrage.

**2    DESCRIPTION OF FINANCIAL TRANSACTIONS AND RELEVANT EXTERNAL ACTORS**

It should be pointed out at the outset that the transactions underlying the disputed dividend reimbursements are very complex.

The underlying transactions are so complex that, in our view, there is a real risk that the present complex of cases will be decided on the wrong basis as a result of misunderstandings about the actors involved, the transactions and the investment strategy itself, *i.e.,* dividend arbitrage.

Therefore, in the following we will explain in detail the financial instruments used, the actors involved, the underlying transactions and the investment strategy applied.

Thus, below – in § 2.1 – the pension plan involved that owned the traded stocks and dividends is explained.

In this context, the trader who carried out the stock transactions in question on behalf of the pension plan is described.

As indicated, the stock transactions in question were used as part of the implementation of the investment strategy commonly known as dividend arbitrage.

§ 2.2 explains the financial instruments used in the implementation of the dividend contribution.

The implementation of this investment strategy has required the involvement and assistance of a large number of actors. In § 2.3 we have described each group of actors involved, including their role and the business rationale for their involvement in the transactions.

In § 2.4, we have also explained the investment strategy in question and, in this context, we have detailed the individual steps in the implementation of the investment strategy.

## 2.1  About the pension plan that acquired Danish stocks

In the present case, the stock transactions in question were all carried out by a U.S. "single-employer" pension plan, a so-called Solo 401K pension plan.

As stated, the pension plan owned the stocks and exchange mergers in question.

The pension plan has the character of a tax-advantaged plan in the United States, in that the pension plan income is not taxed until it is distributed to the beneficiary(ies). The purpose of the pension plan is to generate income/gains through investments and accumulate them until they can be distributed to the beneficiary(ies). In this way, the rules for tax-advantaged pension plans can be aligned with the Danish rules for annuities, which are also taxed only when paid out.

Solo 401K pension plans are established by sole proprietorships that are either incorporated (LLC) or personally owned. The beneficiaries are the business owners themselves and/or their spouses. The beneficiaries (participants) are also called "plan participants."

There are companies, such as the U.S. company Broad Financial, that specialize in providing assistance in setting up pension plans, including **401K pension plans** and **Solo 401K retirement plans**.

Standardized forms are typically used to set up pension plans. These forms are standardized so that the same forms can be used both for the establishment of small Solo 401K pension plans and for the establishment of large pension plans with many participants. For this reason, the forms refer in most cases to administrative committees appointed by the employer's board of directors, even though no such committee exists in a Solo 401K pension plan, since such small pension plans are administered by a trustee appointed by the company owner when the pension plan and the underlying trust are established.

Contributions to a 401K pension plan are held in a trust (set up for the purpose) designed to accumulate, manage and invest these contributions for the benefit of plan participants and beneficiaries. The establishment of a trust separates the pension plan's assets from the business owner's own assets. The trust manages the assets through the actions of the subscribing trustee or other agent.

The Texas Rocco LLC 401K Plan is a (relatively) newly established Solo 401K plan managed by a trust and its trustee.

The actors involved in the pension plan itself can be outlined as follows:



The establishment is thus done by an LLC (the employer = sole proprietorship) establishing a trust (see *e.g.* JEB5 Investment Trust) and the 401k retirement plan (The Texas Rocco LLC 401K Plan). The Solo 401K Pension Plan is the legal owner of the assets and the trust trustee is the subscriber manager thereof.

**2.1.1  Operations on behalf of the pension plan**

As stated, the pension plan in question is a separate legal entity.

It may act only through its trustee in the corresponding trust or a person authorized by the trustee. The so-called trader was thus either the trustee himself or an authorized professional trustee.

In the majority of the cases where SMK and TVC Law Firm are the representatives (the TVC cases), it was the trustees themselves who placed the orders to buy and sell the stocks and entered into the forward hedges and stock loans under the GMSLAs. All the skills and knowledge that the trustees concerned have and use for the benefit of the pension plans must be attributed to the pension plans concerned.

Since the trader must be able to identify the stocks where the price of the derivative (the future or the forward) is out of line with the spot price, and at the same time be able to obtain the necessary financing through a stock loan, a considerable degree of specialist knowledge and business relationships are required to execute dividend arbitrage trades.

**2.2 Financial instruments used**

In the following, we will describe the financial instruments used by the pension plan to implement the investment strategy.

In general, three types of financial transactions are used: a purchase (and sale) of stocks, a forward and a stock loan.

As indicated, the pension plan bought Danish stocks on the dividend date, held them for a period (on average 45 days) and then sold them again. The basic motivation for buying the stocks at that particular time was tax-related: the pension plan was entitled to a reimbursement under the Double Taxation Convention between Denmark and the United States. Unlike others with a less favorable tax status, the pension plan could thus receive the gross proceeds - and not only the net proceeds.

To hedge against the risk of price falls, the pension plan also entered into a forward hedge.

The financing of the stock purchases was done by a stock loan, after the stocks were purchased but before the stocks had to be paid.

These three transactions may at first glance resemble a "puzzle to be solved," as the Danish Tax Agency puts it (see the Danish Tax Agency's summary submission in the lead cases of August 09, 2019, page 12). However, they are nothing more than the expression of well-prepared, financial, structured transactions. In this respect, the financial industry is no different from any other industry: everything must be prepared in advance for the end result to fall into place. Just as the car factory has to have hundreds of individual parts on the assembly line at the right time for the end result to be a working car, so too financial transactions consisting of many links have to be prepared in advance. Just as the car manufacturer enters into framework agreements with subcontractors for the supply of parts, the pension plan enters into framework agreements with Stock Loan Intermediaries who can provide the necessary financing, as well as agreements with brokers who can provide the stocks and forward contracts, and clearing agents/custodians who ultimately ensure that the agreements entered into will be settled.

These preparatory agreements are called "pre-trade" or on-boarding in the financial industry.

**2.2.1 Stock purchase/sale**

The dividend arbitrage investment strategy assumed that the pension plan purchased the stocks on which the dividends in question are paid.

In this context, it is important to highlight that the stocks in question were traded through OTC transactions.

Stocks are bought and sold not only through the stock exchange. Large-volume stock transactions are typically carried out over the counter (OTC). This prevents large price swings that would be triggered by trading large volumes of stocks on public exchanges.

An OTC market is a decentralized virtual market without a physical location. Trading takes place between market participants via the Internet, telephone, e-mail and similar communication systems (messaging systems). In OTC markets, trading between two parties is anonymous, just like on stock exchanges. This means that you can only see how much was traded at what price, but not who bought or sold exactly how much. It is the traders who control the OTC market and it is they who set the price of what they buy and sell for. To trade on an OTC market, you need a broker. The broker can carry out a so-called owner matching trade. The broker then acts as a seller to his client. The broker buys the stock from the market (from another broker or another client). Where the broker obtains the stock, which he sells OTC, the customer cannot know. In many cases, the broker cannot even identify where the individual stock he is selling comes from, as the broker buys many stocks from many different sources. At the broker, all the stocks bought are mixed.

The stock transactions carried out by the pension plan were concluded OTC with its brokers as owner brokers.

Proprietary trading, as defined in § 71(3) of the Capital Markets Act, is the execution of client orders against own funds. The broker - who is precisely not the operator of a regulated market - enters into the trade and acts as a seller to the pension plan wishing to purchase the stocks. The broker obtains the stocks from the market.

The settlement deadline for OTC trades may differ from the "market-conform" settlement deadline. The main feature of OTC trades is that they are not standardized as on the stock exchange. OTC trades are tailor-made.

What exchange trades and OTC trades have in common is that they are immediate trades (spot markets). They take place here and now. Ownership of the stocks is transferred with immediate effect. If you do not want to buy the stocks until a later date, but at a price agreed now, you enter into a forward contract.

### 2.2.2 Forwards

A forward is a bespoke forward contract between two parties to buy or sell an asset at a specific price at a specific time (a future date). A forward is terminated either by physical delivery of the asset or by difference settlement, whereby the parties settle at expiration the difference between the agreed forward price and the spot price (i.e. the current market price) at expiration.

The conclusion of a forward contract is not to be regarded as a disposal of the stocks when/if the forward contract is covered by the Danish Capital and Exchange Gains Tax Act.

It follows from the last sentence of Article 33(1) of the Danish Capital Gains Tax Act that the asset transferred is deemed to have been acquired or disposed of on the settlement date and at its market value on the settlement date if the contract is settled by delivery.

A forward contract falls under the Danish Capital Gains Tax Act if one of the following conditions is *not* fulfilled:

- The contract can only be fulfilled by delivery of the stocks (i.e. not by difference settlement)
- The contract is not transferable
- No counter contract has been concluded.

The question whether the contract can be fulfilled only by delivery or whether difference settlement is possible depends on whether the contract was actually settled by difference settlement (see the explanatory memorandum to the Danish Capital Gains Tax Act, comments on Act No. 439 of June 10, 1997, point n). If this has actually happened, it does not matter whether it was foreseen in the contract.

### 2.2.3 Stock lending

A stock loan is, as the name suggests, an agreement to lend stocks. As a general rule, the stocks lent will be listed stocks, which makes the stocks easily tradable. The stocks lent would therefore be considered a "commodity."

A traditional equity loan is defined by an agreement between a counterparty, the lender (A), and a counterparty, the borrower (B), whereby A lends stocks listed on a regulated market to B for a consideration (fee) and possibly collateral. On transfer of the loaned stocks, ownership rights pass to B, so that B can subsequently dispose of the stocks in full. As a result, B has the right to vote at general meetings, to receive dividends and to sell the stocks.

At the same time as the loan, B agrees to return the same number of stocks to A at a later agreed time. When lending the stocks, it will usually be agreed that A will/should be compensated for the dividends paid on the stocks during the lending period.

Key to below graphic:

Figure 2.4 illustrates a stock loan



Tax qualification and treatment of REPO and stock loans – Master's thesis July 17, 2013 by Nils Panum Thisted

Tax qualification and treatment of REPO and stock loans – Master's thesis July 17, 2013 by Nils Panum Thisted

If B provides collateral to A in the form of cash, this cash collateral will be linked to an obligation on A to pay interest to B. The value of the collateral for a stock loan is typically above the current market price of the stocks.

In this respect, stock lending is fundamentally different from a repurchase agreement or collateralized loan agreement. Repurchase agreements and collateralized loans are similar to stock lending against cash collateral. In all cases, stocks are transferred from one person to another in return for the payment of a sum of money, and in both cases the parties are obliged to return the stocks or the money.

However, the side on which a haircut is applied differs for stock lending and for repos/loans with a pledge on stocks. The Danish Tax Agency seems to overlook this fact in the summary of the preliminary rulings of August 09, 2019 in Paragraph 8.12.

In this context, it should be stressed that a stock loan is made in the interest of the stock borrower. It is therefore the stock borrower who must provide collateral higher than the current market price. Stock borrowers are typically short sellers. Repos and loans against collateral in stocks, on the other hand, are in the interest of the stockholder. The stockholder asks the lender for a loan and puts up his stocks as collateral for the loan.

The transactions can be very difficult to separate, however, circumstantial evidence such as (1) who is making the request and (2) the value of the stocks exceeds the amount paid helps.

If the recipient of the money asks for a loan and provides stocks whose value exceeds the amount he receives as collateral, this is a repo or a loan with a pledge of stocks. A haircut is applied to the value of the collateral he provides to borrow the money.

If, on the other hand, the recipient of the stocks requests a loan and provides cash collateral whose value exceeds the current market value of the stocks, this constitutes a stock loan. In this case, the stockholder is protected against the risk that the stock borrower does not return the stocks (which he wanted to borrow), and therefore the stock borrower must provide a higher amount of cash collateral than the current market value of the stocks.

For further explanations on stock loans and repos, please refer to Katja Joo Dyppel, Taxation of stock loans and repos, SR.2013.0053, see Appendix 2c, and Nils Panum Thisted, Tax qualification and treatment of REPO and stock loans, which is presented here as Appendix 75.

### 2.3 The external actors involved

In order to realize the many structured financial transactions, it is necessary that a number of financial firms participate. These are fund brokers, custodians and clearing houses, as well as stock borrowers and their intermediaries, forward intermediaries, and introducing brokers and arrangers.

As will be seen below, a very large number of players were involved in the completion of the transactions in question, each of whom had special knowledge and/or special contacts or who were exposed to not insignificant risks in the completion of the transactions in question.

### 2.3.1 Brokers

All orders for the purchase and sale of stocks were submitted by the trustee/trader to a professional, authorized and controlled broker in London.

The broker's job is to match a buy order with a sell order. This matching creates the legally binding agreement on the purchase of stocks which, under Danish law, immediately leads to the transfer of civil law ownership to the buyer.

The broker's primary task is to place the order on the market, seeking in his network of brokers and on the exchange to find one (or more) sell orders that match the buy order he has received from his client. The broker himself describes the task as "providing liquidity" for an order. He does not mean that he has to find cash to pay for a certain number of stocks that his client wants to buy.

The liquidity that the broker must provide to his client consists of sufficient stocks to match the client's buy order with the sell order.

The brokers with whom the pension plan traded usually included the equity traders as owner-matching traders. The broker working for the seller thus bought the stocks from the seller himself and sold them on to another broker acting for the ultimate buyer (the pension plan). In other words, the pension plan bought the stocks from its own broker, not from the ultimate seller.

When the broker obtains the stocks from the market, he can do this by buying stocks from several different sources. All the stocks bought by the broker are part of a large pool where it is no longer possible to distinguish which "specific stock" came from which source. Dematerialized stocks are only numbers on securities accounts, which differ as little from each other as monetary funds.

The flow of stocks to the brokers into a large pool can be illustrated as follows:



Nor was the "stock" - of indeterminate origin - that the pension plan subsequently had delivered to its custodial account with its custodian necessarily the very same stock with which its purchase was matched at the broker. This in itself is also irrelevant, as dematerialized stocks are commodities: the pension plan simply needs to be delivered a stock, of the same class and from the same company as it purchased.

For tax purposes, it only makes a difference if you want to check whether the stock that the pension plan bought and was delivered came from a short seller or a long owner. If you want to treat these stocks differently (from a tax point of view), you run into the problem that the pension plan may have bought a stock originating from a long owner (who already has the stock in his custody at the time of sale) from his broker, but when the delivery takes place, the pension plan receives a stock originating from a short seller - or vice versa. And no one is able to distinguish these stocks from each other, in the cycle of stocks that constantly mixed together in pools. If stocks from short sellers were regarded as cold water and stocks from long owners as hot water, what arises for both brokers and custodians is lukewarm water that cannot be separated again.

The broker's fee depends on whether he can get his client the desired number of stocks.

Therefore, the pension plan's payment of the brokers' fees is evidence that the pension plan's orders to buy or sell stocks were matched with corresponding orders that the brokers obtained from the market.

The brokers with whom the traders for the pension plan placed the orders for the purchase and sale of Danish stocks were financial undertakings independent of the Solo group. The broker Novus was indeed bought by Sanjay Shah, but only after the pension plans had stopped using Novus as a broker. It was only in 2013 (before Sanjay Shah took over Novus) that Novus was a broker for pension plans that used the Solo group as a clearing house and custodian.

### 2.3.2 Stock Loan Intermediaries

The pension plan, which was a client of the Solo Group, used a limited number of professional intermediaries (Stock Loan Intermediaries) as counterparties for stock lending. Prior to commencing business, the pension plan entered into Master Stock Lending Agreements (so-called GMSLAs) with Stock Loan Intermediaries. A GMSLA sets out only the general terms of the loans.

Not all pension plans have kept copies of the signed GMSLAs for the simple reason that these are standard agreements that are identical for all pension plans.

Each specific stock loan was concluded by the emails exchanged by the trustee with the stock loan intermediary after the purchase order for the stocks was placed and matched by the broker. It is only these e-mails that contain the concrete information necessary for the conclusion of a legally binding stock lending agreement: which and how many stocks are lent, the amount of the cash collateral, the amount of the fee and interest and the term of the stock loan.

The pension plan and its trustee did not and still do not know the ultimate borrowers of the stocks, the stock lending intermediaries being between them. The pension plan therefore also does not know the motivation of the ultimate stock borrowers to borrow the stocks.

Before the pension plan purchased a given stock, the pension plan inquired by telephone with the intermediaries how many stocks the intermediaries needed to lend, i.e. could convey to a final borrower. This was to ensure that the pension plan only purchased a number of stocks that the pension plan could subsequently lend. Thus, the e-mails from the intermediary to pension plans, presented in the cases, in which pension plans are asked whether they have a certain number of stocks, were sent after the pension plans had already been in contact with the intermediary.

Thus, the stock loan agreements are not "backdated" as claimed by the Danish Tax Agency.

Nor is there a "piece to fall into place" or a "puzzle to unravel" in order to finance the stock purchase, as the Danish Tax Agency claims. The Danish Tax Agency's allegations rest on a lack of knowledge of the practice of dividend arbitrage.

### 2.3.3 Forward counterparties and intermediaries

The Pension Plan has not been aware of the identity of the ultimate forward counterparties, as the forward contracts have been traded through intermediaries. The intermediaries thereby enter into the contract themselves (as in the case of an owner trade) and are themselves the immediate forward counterparty of the pension plan.

The ultimate forward counterpart motivation is therefore also unknown to the pension plan.

The Pension Plan has not promised the purchaser of the Forward (neither the Intermediary nor the Ultimate Forward Counterparty) anything as alleged by the Danish Tax Agency in the Summary Submission in the Lead Cases dated August 09, 2019, Paragraph 2.3 (page 10). At the very least, the pension plan has promised the counterparty to the forward a price increase. The ultimate counterparty to the forwarder simply has a conflicting interest with respect to the pension plan: He wants to own the stock on a certain date after the date of the stockholders' meeting. Whether this is because the ultimate counterparty, for <u>his own motivation,</u> expects a price increase, or because the counterparty, for (tax) reasons, simply does not want to own the stock on the dividend date, but wants to secure the purchase of the stock at a certain price on a later date, the pension plan as an independent party cannot say.

An important aspect of the present case is that the stocks purchased were never delivered under the forward hedge, as the pension plan always settled the forward transaction with the forward counterparties on a contractual basis, i.e. settled the difference between the agreed forward price and the spot price (market price) at the time of the expiry of the forward contract. In this way, the pension plan avoided that the forward contracts could be considered as a disposal of the acquired stocks for tax purposes.

It was essential for both the pension plan and the ultimate counterparties to the forward contracts that the forward contract would be covered by the Danish Capital Gains Tax Act, so that the conclusion of the forward contract is NOT to be considered as a disposal of the stocks. As stated in the preparatory works to the Danish Capital Gains Tax Act (comments to Act No. 439 of June 10, 1997, point n), the question whether a contract can only be fulfilled by delivery or whether difference settlement is possible depends on whether the contract has actually been settled by difference settlement. If this has in fact happened, it does not matter whether it was foreseen in the contract.

### 2.3.4 Custodians and clearing agents

Custodians and clearing agents have a dual role. On the one hand, the custodian has the task of maintaining the pension plans' securities (stocks). This role can only be fulfilled by the custodian once the stocks have been transferred from the seller's custodian to the buyer's custodian. This is done through the settlement process. At the settlement of the stock trade, the purchase price must be paid against the delivery of stocks (payment versus delivery). In other words, money and securities must be exchanged between the custodians involved.
This can be either on a gross or net basis.

If settlement is on a gross basis, the specific stock sold is exchanged from one custodian to another against the transfer of the specific purchase price.

Settlement on a gross basis can be illustrated as follows:



If settlement is on a net basis, all equity transactions in the settlement period (which is not necessarily a full day) are first netted between the custodians concerned before the net balance is transferred between the seller's and buyer's custodians.

Settlement on a net basis can be illustrated as follows:



At the time of clearing, the obligations to be exchanged are determined. If the clearing takes place using nets, several transfer orders between the custodians involved are rearranged and offset to form a net claim, so that only the net obligation is transferred between the two custodians (cf. Article 3(1)(29) of the Capital Markets Act).

If the buyer and seller have the same custodian, the stock transaction is settled internally in accordance with Article 9 of the CSD Directive (settlement internalizers), so that no stocks are sent from custodian to custodian. The clearing and settlement of transactions is nevertheless real, and increasingly closely regulated by the EU.

Custodians and clearing agents will in principle only become active after the final and binding agreement on the transfer of ownership of the stocks has been concluded.

However, as the clearing agent guarantees the performance of a concluded agreement for the purchase and sale of stocks (as guarantor for the payment of the purchase sum and the delivery of the stocks) the broker and the trader must both inform the clearing agent of the intention to conclude a stock trade, which is only matched once the clearing agent has given an undertaking that the contractual obligations will be fulfilled.

Because of this risk, which the clearing agent assumes in settling trades entered into by a pension plan without sufficient equity to pay for the stocks purchased, and the need to obtain a stock borrower for the specific number of stocks purchased by the pension plan, the clearing agent charges a substantial fee. A fee that the clearing agent either demands to be paid to itself or (for tax reasons) to an affiliated company.

Because of the high risk of having to guarantee the payment of purchase sums of such a considerable order as in the stock transactions in question, the fee charged by the Solo group for its services as custodian and clearing agent was also quite substantial. Fees in the order of 70-80% of profits are normal in the industry and were also paid by the pension plans.

These fees were deducted from the pension plans' cash account with their custodian. As the money under the TTC clause was already in Solo Capital's account, the payment of the fees only appeared by an entry in the pension plans' cash account with their own custodian. The TTC clause in the Custody Agreements was a security for the Solo group in case the clearing agent/custodian had to step in and pay the purchase price in a given stock transaction.

### 2.3.5 Tax agents

The reimbursement requests were submitted by a professional tax agent on behalf of the pension plan. The task of the hired tax agent was to verify that all conditions for obtaining a reimbursement from Denmark were met and duly documented.

The tax agent in question received a fee for his services.

Since the tax agent engaged was responsible not only for requesting the reimbursement but also for monitoring it, the reimbursement had to be paid from Danish Tax Agency to the tax agent. The tax agent informed the pension plan of the receipt of the respective reimbursement and transferred all reimbursement amounts to Solo Capital's cash account, as shown in Appendix 76, which is presented here. This had a discharging effect on the tax agent in question, as the pension plan had its account with the Solo Capital group. In the Solo group, the receipt of each reimbursement was booked to the account of each pension plan.

Solo Capital was entitled to receive the reimbursement amounts due to the pension plan, as the pension plan had assigned the ownership of all its cash as collateral to its custodian.

This assignment as security for cash was made under the TTC clause of the Custody Agreement.

The transfer of ownership rights to the reimbursement amount does not contradict the GMSLA as alleged by the Danish Tax Agency in the Agency's summary submission in the lead cases dated August 09, 2019, as the GMSLA only pledges the assets belonging to the pension plan. The cash only belongs to the pension plan for "a logical second," after which it is immediately transferred to the custodian's ownership under the TTC clause.

However, all funds accruing to the pension plans were recorded in separate accounts at the Solo- Group, so that the funds of each pension plan could be identified and released from the guarantee at any time. This was done on the basis of advice received from the law firm Pinsent Masons, which, as you know, is the Inland Revenue's own law firm in England.

If the pension plan had no outstanding balance with its custodian, i.e. if the custodian had not had to pay a stock deal on behalf of the pension plan, the pension plan could at any time terminate the contract with its custodian and request both funds and stock deposits to be transferred to another custodian/bank. The custodian in question had no rights to the stock deposits at any time and the transfer of ownership of the funds was for security purposes only.

### 2.3.6    Introducing brokers

Since it is not easy to find all the financial companies described here that are willing to accept a newly founded single man pension plan as a customer to invest in large Danish stockholdings without having sufficient equity capital themselves, so-called introducing brokers are necessary. An introducing broker introduces clients to the various financial companies for a fee.

### 2.3.7    Arrangers

Finally, the pension plan needed a so-called arranger. An arranger is an agent with exclusive access to certain networks, companies or business concepts (intellectual property rights). An arranger also invoices the pension plan for its services.

### 2.3.8    Summary remarks on the external actors involved

The remuneration of the large number of financial institutions involved, who had special knowledge and contacts or who assumed certain financial risks in the execution of the stock transactions, left the pension plan with a smaller stock of the total proceeds of the dividend arbitrage. This corresponds to market practice and is no indication that the various actors were not independent of each other or that the pension scheme merely acted as a 'front man' for other parties involved, as the Danish Tax Agency seems to suggest.

The pension plan was not under the control of Sanjay Shah and could also switch to another financial company at any time. This is also evidenced by the fact that some pension plans were first clients of Solo Capital and subsequently of North Channel Bank. The pension plan does not know the specific names of the pension plans that changed clearer and custodian, but knows that it happened.

The tax authorities are in a better position to name the pension plans that have filed reimbursement claims on the basis of a DCA issued by Solo Capital and later by North Channel Bank.
### 2.4 Pension plan business model and transactions

**2.4.1 Introduction to dividend arbitrage**

The pension plan used the investment strategy known as dividend arbitrage. Dividend arbitrage is basically investing in stocks around the dividend date.

The business model is possible due to the fact that not all stockholders have the same tax status. Some pay more dividend tax than others. Some (like the pension plan) are exempt from paying dividend tax altogether. Stockholders who are (fully or partially) exempt from paying dividend tax thus receive a higher income from the dividend distribution than other stockholders who are less favorably treated.

Stockholders who do not have access to a double tax treaty know with certainty that on the dividend date they will lose 27% of the dividend. A U.S. pension plan does not lose this 27%. Stockholders who are not in the same tax position as the pension plan will therefore want to sell the stocks over the dividend date. They usually do this by selling the stocks shortly before or on the dividend date itself at the current market price (which still includes the entire gross dividend) and buying back stocks from the market by buying a forward contract.

The day after the dividend date, the stocks fall in price, as the company has lost value due to the dividend payment. Theoretically, the day after the dividend date (also called the ex-date, as this is the first day on which the stocks are traded ex-dividend) the stocks should fall by the same amount as the gross dividend. After all, this is the value that the company loses in dollars and cents on the dividend itself.

In practice, however, the price almost never falls by exactly the same amount as the gross dividend. This fact alone encourages speculation on price movements around the dividend date and hence increased trading activity at that particular time.

The speculative transaction becomes an arbitrage investment by the parallel investment in a forward contract.

Arbitrage is an economic term for the trading of similar goods (and services) in separate markets. The purpose of trading is to exploit visible price differences in different markets. If the same good is traded in two different markets at a different price, the arbitrage opportunity arises: The same good is bought and sold simultaneously in different markets and the arbitrageur can immediately see which profit he will realize.

The different "markets" in question cannot be just different stock exchanges. One and the same stock is not necessarily traded at exactly the same price on all exchanges. The different markets that an arbitrageur can target can also be the stock market itself and the derivatives market such as the forward market. The price of a stock bought immediately on the so-called "spot market" is not the same as the price of the same stock traded over a forward contract.

The price of a stock traded over a forward contract already differs from the actual purchase price of the stock because of the interest factor: if one agrees over a forward contract to buy a stock at a certain point in time in the future at a certain price, the interest itself on the purchase price will be included in the price of the forward contract and thus differ from the stock price on the spot market.

However, the price of the forward contract may also differ from the spot price for many other reasons. One reason for the forward price to be out of balance with the forward price (as it would be if only the return on the purchase price were factored in) may be demand from "former stockholders" who

sell their stocks to the market by the dividend date to avoid the loss of the 27 percent dividend tax. Since the original stockholder without a double taxation agreement knows that he will lose the 27% dividend tax when the dividend is distributed, the dividend and therefore the stock itself has a lower value for him than for a pension plan entitled to a reimbursement. This subjective difference in value, caused by discrimination against some stockholders compared with others, sets the market in motion. The loss of value that occurs on the ex-date is smaller for tax-advantaged pension plans than for other stockholders. The pension plan can therefore resell the stocks to the former owners under a forward agreement at a higher price than the forward price would have been, as the buyer of the forward will still be financially better off than if he had kept the stock, received a net dividend and suffered a loss in value of his stock on the ex-date in the order of the gross dividend.

The pension plan suffers an immediate "loss" on the ex-date, as the stock also in his possession loses value. The gross proceeds are deducted from the market value of the stock. However, in the case of the pension plan, this loss is fully offset upon receipt of the net proceeds and the reimbursement. This leaves the pension plan with the gains it can realize on the arbitrage transaction: the purchase of the stock on the spot market and the sale of the stock on the derivatives market (forward contract).

Although the gain realized by the pension plan was equivalent to the reimbursement of the dividend tax, the gain itself did not consist in the reimbursement as claimed by the Danish Tax Agency. The gain realized stemmed from the arbitrage transaction itself. The pension scheme could not risk losing this in the event of market movements and therefore had to close all positions once the arbitrage gain had fallen to the amount of the reimbursement.

That dividend arbitrage is a perfectly legitimate investment strategy is shown in the brochure of the FCA from June 2017, which is provided as Appendix 77.

**2.4.2 Transactions**

The following § describes the business process of dividend arbitrage in practice, highlighting each step.

### 2.4.2.1  Onboarding

Prior to the launch of the pension plan's trading activity, the pension plan has gone through extensive account opening procedures with all of the financial institutions involved, including the broker (fund broker), the intermediaries for the forward contracts and the stock loans, as well as the clearing and settlement agent and the custodian.

The necessary contractual framework had to be in place before the pension plan could implement the business activity, including the framework agreements with the equity loan intermediaries (GMSLA agreements). This ensured that a concrete agreement for the lending of a concrete number of stocks on a concrete date could be concluded by e-mail and at short notice.

### 2.4.2.2  Buying stocks and selling forward

#### 2.4.2.2.1 Procedure for buying and selling stocks of forward

The first step in the actual dividend arbitrage transactions has been to place a buy order with the fund broker. Once the pension plan trustee (or the trustee-Authorized Trader) has identified a particular stock where the price of the derivative (future/forward) is out of line with the price of the stock itself on the spot market, the trustee inquires by telephone with its stock loan intermediary whether there are

Is an interest in borrowing stocks in the company concerned. If the stock lending intermediary indicates that there is a general demand in the market to borrow a particular stock, the pension plan trustee places an order to purchase a certain number of stocks with the broker (execution broker).

The broker then contacts his network to identify one (or more) suitable sales orders on the market. Trading does not necessarily take place on the stock exchange. Large volumes of stocks, such as those needed to make dividend arbitrage profitable (since the price differential between the spot and derivatives markets is so minimal), are generally traded OTC, i.e. outside the exchange. This is to prevent the risk of (illegal) market manipulation. See above under § 2.2.1.

If the broker identifies one or more suitable sell orders in his network of brokers, he communicates this to the pension plan trader, who is asked to obtain the clearing agent's agreement that settlement will take place. In parallel, the seller's clearing agent is asked to agree that settlement will take place. Thus, the buyer's clearing agent guarantees that the purchase price will be paid and the seller's clearing agent guarantees that the stocks will be delivered. If the clearing agents receive these messages about the dividend date and can see that the settlement date is after the record day, the transaction is flagged in the computer systems (as "cum ex trade") so that the respective custodians are aware that a market claim occurs when the dividend is paid.

"Record day" is the date on which the company (VP Securities) verifies who is registered as the owner of the Danish stocks. The dividend will be sent by VP Securities to the person registered as the owner of a stock on the "record day." If a stock trade has not yet been settled on the record day, VP Securities will immediately send the dividend to the wrong recipient, namely the seller. For example, if the seller has his securities account in Nordea and the buyer has his securities account in Danske Bank, VP Securities will send the dividend to Nordea. However, Nordea can see that the stocks have been transferred to Danske Bank after the record day. Nordea is therefore obliged under the so-called "market claim process" to forward the dividend to Danske Bank, where the rightful owner of the stock has his securities account.

Thus, during the market claim process, the respective custodians are obliged to debit the net proceeds received by the seller in the first place because he was still registered as owner on record day and transfer these net proceeds to the buyer of the stock.

If the broker does not find a suitable sell order in the market, the buy order cannot be fulfilled and the money plan does not become the owner of Danish stocks. Examples of purchase orders that were not matched are presented as Appendix 78. Unfortunately, not all pension plans have kept copies of the purchase orders that were not matched, as they had no legal or financial consequences.

Since the pension plan will only buy the stocks if it can simultaneously sell the same number of stocks via a forward, the pension plan's trader sends in parallel with the order to buy stocks also an order to sell the same number of stocks via a forward contract.

These two orders (buying stocks and selling a forward) are not necessarily sent to the same broker. If the broker can identify another broker (in its network) who has a client who wants to buy the stocks over a forward, the pension plan's broker communicates this to the pension plan, which in turn is invited to obtain the clearing agent's commitment to guarantee the settlement.

The pension plan then asks its clearing agent for a commitment to settle the stock purchase and forward sale. If the clearing agent agrees, this is communicated to the pension plan and the brokers, who then match the trades. All this happens within seconds/minutes over electronic communication systems.

The brokers carry out the trades as so-called owner-matching trades. This means that it is the respective brokers who enter into the purchase agreement as a party. There is no direct contact between the pension plan and the ultimate sellers of the stocks. The seller of the stocks is and therefore remains unknown to the pension plan. There is no contractual link between them.

As a broker simultaneously enters into several owner matching trades with different brokers over stocks issued by the same company, it is not possible to subsequently identify the original owner of the stocks purchased by the pension plan. At the broker, all the stocks are thus mixed together in a pool where it is subsequently no longer possible to trace a particular stock back to a particular original seller.

The moment the brokers match the trades, the pension plan becomes the owner of the stocks. Within three seconds of the orders being matched, a trade report is automatically sent to the London Stock Exchange (LSE) and the settlement of the trade is simultaneously initiated by settlement instructions sent automatically to the clearing agent. In addition to this trade report, which is addressed to the public, a transaction report is also sent to the FCA (via the LSE's Una- vista MIFIR Reporting Portal - see Sanjay Shah's pleading to the High Court in London, Paragraph 56.9). This "transaction report" is used in the supervisory authorities' control and monitoring of stock transactions. Both reports are sent electronically and fully automatically from the trading systems (computers) where the traders were matched.

After the matching of the buy and sell order, the time limit for the settlement of the trade starts to run. Trades that were to be settled through Solo Group companies, like many other OTC trades, were settled with a day longer deadline than VP Securities (as the national CSD) settles trades. Clearing agents have a duty (also under FCA rules) to ensure that the risk of a fail is avoided - i.e. that a trade cannot be settled - and a longer settlement period is used for this purpose, particularly when dealing with such large pools of stocks as those at issue in this case. Thus, until 2015, stock trades were settled four days after the orders were matched (T+4), and from 2015 onwards, stock trades were settled three days after the match (T+3).

### 2.4.2.2.2 Business rationale for the purchase/sale of stocks by the pension plan and the stock seller

The main actors in a dividend arbitrage transaction are, of course, the buyer and the seller of the stocks. These have conflicting interests: while the seller does not want to own the stocks at the date of legal acquisition of the dividend (the dividend date), the buyers have precisely the interest of being the legal owner of the stocks at that date.

The ultimate seller's motivations for not wanting to own the stocks on the dividend date may be many, as indicated. As a result of the ineligibility for a reimbursement under the double taxation treaty to which the seller is subject, the seller may have an interest in selling the stock, if possible, at a price that includes 100 percent of the value of the gross dividend. He would then be in a financial position as if he were subject to a double taxation agreement which entitled him to a reimbursement of the full dividend tax. The seller may also wish to be taxed on a stock profit - rather than being taxed on the stock dividend. In this situation, the seller will seek to sell the stock (including dividends) at a higher price than the repurchase price of the stocks after the dividend date (i.e. excluding dividends).

Furthermore, speculators may of course speculate that the market price of a stock will not fall in line with the value of the dividend. Such speculators may also act as sellers of stocks before the dividend date. There are, of course, many other real economic incentives to sell stocks before the dividend date. The pension plan cannot know what has been the incentive of a given ultimate seller to sell before the dividend date. However, it is noted that there may notoriously be many different incentives to do so.

The pension plan bought the stocks with the aim of realizing a profit by buying the stocks on the spot market and selling the stocks through a forward or a future.

The pension plan trustee/trader can simultaneously view both the spot market price and the forward market price.

/futures market and thereby immediately calculate the profit to be realized by buying the stocks on the spot market and selling them through a forward or a future. The only condition for this gain to be realized in reality is (1) that the dividend tax reimbursement is paid and (2) that the pension plan can bear the cost of the stock lending that finances the purchase price of the stocks.

The pension plan's calculation of investment profitability is based on the assumption that the pension plan does not lose the dividend tax on the ex-date, but is entitled to receive a reimbursement. Otherwise, the pension plan would be at the same disadvantage as a seller who does not have access to the dividend reimbursement. Without a reimbursement, the pension plan has overpaid for the stocks before the ex-date.

The acquisition of the stocks in question by the pension plan was financed by the collateral provided by the stockholders. While stock borrowers have to pay a fee for the stock loan, the pension plan has to pay interest on the cash collateral. The fee and interest rate are variable amounts which are constantly renegotiated between the parties depending on current market conditions. This creates uncertainty for the pension plan in terms of funding costs, which may force the pension plan to sell the stocks before the maturity date of the forward or cause the pension plan to extend the stock loan and the hedge beyond the initial maturity.

In the event that Danish Tax Agency did not want to pay the reimbursement to which the pension plan was entitled, the pension plan did not have sufficient equity capital to immediately survive this loss of dividend reimbursement, which corresponded to 27% of the dividend. In order to counter this risk, the pension plan had to sell the stocks on the spot market and call back the stock loan when the financing costs of the transaction reached an amount equal to the previous gain without the dividend tax. The pension plan would then still reach a zero result if Danish Tax Agency did not have to pay the reimbursement. This is therefore also the reason why the gain realized on the transactions is equal to the amount of the dividend tax. However, the reimbursement of the dividend tax is only a reimbursement of the profit lost by the pension plan, as the pension plan had bought the stock the day before the ex-date for a price including gross profit, but only received a net profit from the Danish company during the settlement of the market claim process.

### 2.4.2.2.3 Business justification of the pension plan and the forward buyer for the sale/purchase of the forward

The business rationale for entering into a forward is essentially to hedge a risk position: if you have a stock position, you can hedge the risk of price fluctuations by selling a forward contract. This is an agreement to sell the stocks at a certain time in the future at a certain price.

The buyer of the forward contract also hedges against price fluctuations by buying the stocks under a forward contract: He knows at what price he can buy the stocks in the future. This can be an important argument for a short seller or for a stockholder who sells his stocks before the dividend date to avoid the dividend tax.

As it had no direct contact with the counterparties to the forward contracts, the financial plan cannot comment on their specific motivation. There was always an intermediary between the pension plan itself and the ultimate forward counterparty.

The ultimate counterparty to a forward hedge may have had numerous reasons for entering into an agreement with the pension plan.

Thus, the ultimate buyer of a forward can hope that the stock price will rise again quickly after the date on which the stock is no longer traded with dividend rights (ex-dividend date). Empirical studies thus show that the stock price on the ex-dividend date does not always fall by exactly the same amount as the gross dividend, and that the stock price rises faster than usual after the ex-dividend date.

The ultimate counterparty to a forward may also be a foreigner who sells his stock before the dividend date in order not to lose the dividend tax for which he is not entitled to a reimbursement. He may wish to secure the right to repurchase an equivalent amount of stocks in the company from the market at a specified price. He may give the arbitrageur an incentive to buy the stocks in-between the dividend date and sell stocks after the dividend date by pricing the forwarder high. The counterparty to the forwarder can thereby bring the price of the forwarder out of equilibrium with the spot market.

### 2.4.2.3 Stock lending and financing of stock purchases

### 2.4.2.3.1 The procedure for stock lending

The pension plan finances the purchase of the stocks by lending the stocks and paying the stock seller with the cash collateral received from the stock borrower.

The ex-dividend date, which is the first day on which the stocks are traded without entitlement to dividends, occurs between the trade date and the lending date and settlement date. Thus, even if the value of the stocks is lower on the lending date than on the trading date, the stock borrower provides cash collateral equal to the purchase price on the trading date. This is normal market practice, as the stock lender normally always pledges more collateral for the stock loan than the current market value of the stocks, see § 8.1 of this document. This is precisely what distinguishes a stock loan from a loan against a pledge of stocks. Here, it is the value of the stocks that exceeds the value of the loan.

In the case of stock loans, however, it is the stock lender who is protected against the risk that the stock borrower (who in many cases is a short seller) cannot return the stocks borrowed. Therefore, the cash collateral exceeds the current market value of the stocks.

As stated above, prior to the purchase of the stocks in question, the pension plan had already concluded a GMSLA framework agreement with the stock lending intermediary, which contains the general terms and conditions for the stock lending. The pension plan and the stock lending intermediary then agree on the specific terms as to which stocks, the number of stocks, the loan fee, the interest rate, etc. These agreements are concluded by e-mail. Once the stock loan intermediary and pension plan agree on the loan terms, the stock loan is communicated to the clearing agent and custodian. They check that the stock lending message received from the stock lender corresponds to the message received from the stock lending intermediary. If this is the case, the stock lending is confirmed.

As the pension plan uses the cash collateral from the stock borrower to pay the purchase price of the stocks, the stock lending must be settled on the same day with the clearing agent and custodian as the stock purchase itself. Without payment of the purchase price, the stocks are not delivered to the pension plan's custodial account with the custodian.

The settlement of the stock purchase will take place in parallel with the settlement of the stock lending. The stocks are thus registered three or four days after the purchase of the stocks, first in the pension plan securities account and then in the stock-borrower securities account. This registration in the pension plan's account is crucial for the correct settlement of the pension plan's market claim and for the pension plan's receipt of the proceeds that were initially wrongly sent by VP Securities to the seller's account.

Even if all the conditions are agreed by e-mail when the stock loan itself is concluded, this does not mean that the conditions for the stock loan are fixed. As the stock loans did not have a fixed term (see: "*term: open*"), they were open to constant renegotiation, i.e. the pension plan could demand a different fee at any time and the stock borrower could demand a different interest rate at any time by threatening to terminate the loan immediately. If the pension scheme had an interest in continuing the stock loan, it would accept the changed conditions. The same was true for the stock borrower.

As an example of these e-mails, by which the stock loan terms were continuously modified, is provided Appendix 79.

The formula stated by the Danish Tax Agency in the summary submission of August 09, 2019 in the lead cases, Paragraph 4.5, page 28, is therefore quite correct, but it cannot be used to arrive at the exact amount that the total Stock Lending Fee constituted. Without knowing the exact interest rate applicable on each day at any given time, it is not possible to calculate backwards, as the Danish Tax Agency attempts to do on page 29.

Since the Danish Tax Agency applies the wrong interest rate to all calculations of all stock loans for all pension plans, the Agency naturally also arrives at the same "calculation error" in all cases. When the Agency reaches the conclusion that there is an error in all the cases, the Agency should instead come to the conclusion that there must be an error in the Agency's approach and take into account variable interest rates for the different days.

The fact that the Danish Tax Agency cannot make its own calculations add up is not a sign of fraud, but a sign that the Agency does not know how the stock lending industry works in reality.

### 2.4.2.3.2 Business justification for stock lending by the pension plan and the stock borrower

The pension plan needs cash to pay for the stocks purchased. These are obtained by lending the stocks and receiving a cash collateral for the stocks equal to the purchase price. The financial services industry refers to these as "cash-neutral transactions."

The stock borrower may have many reasons for wanting to borrow the stocks.

It is therefore incorrect for the Danish Tax Agency to claim that the sole purpose of the stock borrower was short selling.

The stock borrower may thus need the borrowed stocks for hedging purposes. The stock borrower may also be a bank wishing to dispose of large cash balances in order to have a different, more valuable asset on its balance sheet than cash. A stock borrower may also be an investment firm that needs to respect a certain asset allocation (risk diversification) and therefore needs more stocks in its portfolio at the accounting date.

The European Central Bank also explicitly refers on its website (https://www.ecb.eu- ropa.eu/explai-ners/tell-me-more/html/securities_lending.de.html) to the existence of many years to borrow a stock: If you only need a stock temporarily for a day or a few weeks, it is often cheaper, quicker and less risky to borrow the stocks rather than buy them. Many different strategies used in the financial markets rely on stock lending. The borrowed stocks can be used for trading (taking a risk to realize a gain), arbitrage (realizing a risk-free gain from price differences) or hedging purposes (reducing risk). If, for whatever reason, stocks are delivered late, stock lending may be an option to obtain the missing stocks on time.

It should be noted in this context that the world's largest national banks themselves act as borrowers of securities as a means of realizing their monetary policy. This allows national banks to pump additional liquidity into the market in order to increase the money supply and thereby raise inflation.
Thus, it is also common knowledge that the Swiss and Japanese national banks are registered as the world's largest owners of listed stocks - whether these are bought or borrowed.

The size of the global equity lending industry is USD 10 trillion, so it is obviously impossible to account for all the possible motivations that an equity borrower might have.

The stock borrower will therefore not necessarily have the expectation that the stock price will fall, as claimed by the Danish Tax Agency in the submission.

The stock borrower and the pension plan have conflicting interests: while the pension plan has stocks and needs cash, the stock borrower (who has cash) needs the stocks. Both parties in a stock loan charge for their services: the stock borrower charges interest on the cash collateral he has to provide, and the pension plan charges a fee for lending the stocks. Who thereby realizes a loss and who realizes a gain depends on current market conditions and the bargaining skills of the parties involved.

### 2.4.2.3.3 Other comments on the financing of stock purchases

Pension plans that do not have enough equity to pay for the stocks themselves trade under what is known as "margin trading" or leverage. This allows a huge number of stocks (or other assets) to be traded without using equity. All the investor needs is a prime broker to provide the investor with the necessary capital.

Arbitrage transactions (not just those made around the dividend date) can be financed without equity when the gain from buying a stock on the spot market and simultaneously selling the derivative on the forward market can be determined immediately. As a rule, the price difference between the spot and forward markets is minimal. It therefore takes a huge volume of trading to generate enough profit for the strategy to pay for all the services involved.

Prime brokers, who in the present cases were custodians, and clearing agents do not necessarily have to directly fund the investor themselves in the form of a credit.
The prime broker can also simply act as a guarantor that payment for the stocks will be made. If the pension plan obtains the necessary financial means to pay for the stocks by lending them against a constant collateral, the role of the prime broker is limited to that of guarantor.

### 2.4.2.4 Settlement of transactions (settlement)

The actual settlement of the stock purchases was carried out four days until 2015 and three days after the stock purchases and forward sales from 2015. The stock purchases were settled by clearing and settlement (settlement). It was the clearing agent's task to calculate the total amount of money going from the buyer's custodian to the broker (and from there on to the ultimate seller), and the total number of stocks going from the custodian's securities account to the pension plan's securities account.

These settlements may be on a gross or net basis. This means that each trade can either be accounted for separately and each number of stocks transferred separately to the pension plan custodian (gross settlement). Alternatively, all purchases and sales to be settled between the broker's (= seller's) custodian and the buyer's custodian can be netted against each other, and all acquisitions and sales of

stocks are netted (offset) so that only one net sum of money is transferred and only one net total of stocks is transferred between the buyer's and seller's custodians (net settlement after netting).

If netting is used during the clearing and settlement procedure, a stock can never be traced from the ultimate seller to the pension plan that bought the stock. After netting all purchases and sales, the pension plan will most likely not receive a stock that was at one time in the custody of the broker or the ultimate seller, but a stock that was previously in the custody of another client of the same custodian. This is precisely the purpose of netting: Fewer stocks are transferred between different custodians.

If, on the day of settlement of the trade, the pension plan has not yet received the cash collateral for the stock lending, the clearing agent is liable to the broker (seller) for the payment of the purchase price. Once the buy and sell orders have been matched, the settlement of the trade can no longer be stopped.
The clearing agent is obliged to pay for the stocks himself if the buyer does not have sufficient funds.

It should be noted that in none of the transactions carried out by the pension plan did the clearing agent have to pay the purchase price until a stock loan was in place.

The pension plan settled the stock purchase, the forward and the stock lending on the same day. The pension plan was thereby registered as the owner of the stocks four and three days respectively after the purchase. The pension plan was thus the owner of the stocks for a period of four and three days respectively, without this being registered with the custodian.
Registration with the custodian only occurred when the pension plan paid for the stocks and had them delivered to its custodial account. This meant that for the first four or three days after the conclusion of the purchase agreement, the original owner was still registered as the owner of the stocks, even though he was no longer the legal owner of the stocks.

After the pension plan had been the legal owner of the stocks for several days, the pension plan lent the stocks so that the purchase price could be paid. The stock borrower was then registered as the new civil law owner.

However, registration of ownership of the stocks is not a prerequisite for acquiring ownership under Danish law. Registration is only declaratory and serves to secure the rights as owner against third parties. In this respect, Danish law differs fundamentally from German law. It is therefore fatal for the Danish Tax Agency to base its entire reasoning in the case on German case law.

The tax authorities attribute to the registration of ownership with the custodian a significance for ownership which the custodian does not have. The ownership of the pension plan does not start with the registration of the purchase with the custodian, which is why there is no "review ownership" of the stocks for a few minutes when the pension plan is first registered as the owner and the stock borrower is then immediately registered as the civil law owner during the stock lending. The pension plan was the owner of the stocks already from the matching of the purchase order.

### 2.4.2.5 Maturity of transactions

As stated above, the stocks purchased were never delivered under the forward hedge as the pension plan always settled the difference with the forward counterparties.

The pension plan never held the stocks for the exact same period as the forward contract term. On average, 90 days elapsed between the purchase and sale of the stocks by the pension plan. This maturity was achieved either by (1) extending the forward contracts (so-called "roll-over"), (2) purchasing another forward from the market with the same settlement date as the originally sold forward contract or (3) by an earlier difference settlement of the sold forward contract. That the maturity of the forward was generally not respected is proof that the transactions are genuine, since they are subject to market movements.