# Exhibit 145

CONFIDENTIAL
Arthur Woodard - November 18, 2021

1              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF NEW YORK
2            MASTER DOCKET 18-MD-2865(LAK)
               CASE NO.  18-CV-09797
3

4    _____
                                            )
     IN RE:                                 )
5                                           )
     CUSTOMS AND TAX ADMINISTRATION OF      )
6    THE KINGDOM OF DENMARK                 )
     (SKATTEFORVALTNINGEN) TAX REFUND       )
7    SCHEME LITIGATION                      )
                                            )
8    _____)

9

10

11

12              C O N F I D E N T I A L

13

14

15     REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

16                  EXAMINATION OF

17                  ARTHUR WOODARD

18

19            DATE: November 18,  2021

20

21

22

23

24

25        REPORTED BY:  MICHAEL FRIEDMAN, CCR

1    and Kaye Scholer.

2        Q    Can you tell us what was the nature

3    of your practice?

4        A    In general, I characterize it as

5    employee benefits.  A lot of people

6    characterize it as ERISA.  That's sort of the

7    shorthand, but I think it's a little broader

8    than that, so I -- that's what I call it.

9        Q    And as part of your practice, did

10   you deal with retirement plans?

11       A    Yes.

12       Q    And did that include 401(k) plans?

13       A    Yes.

14       Q    And solo 401(k) plans?

15       A    Not typically.

16       Q    What is a -- what is a 401(k) plan?

17       A    I'm sorry?

18       Q    Can you just --

19       A    A 401(k)?

20       Q    Yeah.

21       A    These are -- 401(k) plans are is a

22   defined contribution plan that generally the

23   employer and employee make contributions to

24   in order to build up a retirement benefit on

25   a -- on a before tax basis.

CONFIDENTIAL
Arthur Woodard — November 18, 2021

1    characterization.

2           I did not work that often with

3    Mr. Ben-Jacob before I retired in some -- a

4    couple of years, I think, he was at the firm

5    before I retired.

6       Q    Did you understand that his client

7    base, as a general matter, were -- were

8    families or individuals with a net worth

9    somewhere between $100 million up to a couple

10   billion dollars?

11      A    No, I did not know with that

12   specificity.

13      Q    Did you generally understand that

14   his practice was focused on high net worth

15   individuals or family offices?

16      A    I really can't answer the question.

17   I -- I don't -- I -- I don't have a good

18   sense of what I thought at that point in

19   time.

20      Q    Did there come a time when you were

21   working with Mr. Ben-Jacob for Argre

22   Management?

23      A    Yes.

24      Q    And what was Argre?

25      A    They were a -- they were basically

CONFIDENTIAL
Arthur Woodard - November 18, 2021

1    a group of four individuals that had formed a

2    partnership for investment, I assume other

3    purposes.

4        Q    And did the individuals include

5    John Van Merkensteijn and Richard Markowitz?

6        A    Yes.

7        Q    And how about Luke McGee and

8    Matthew Stein?

9        A    I'm sorry, can you repeat it?

10       Q    Luke McGee?

11       A    I don't recollect.

12       Q    Matthew Stein?

13       A    I don't recollect.

14       Q    Jerome Lhote?

15       A    Yeah, I did.

16       Q    And what do you recall of the first

17   transactions in which you were helping

18   Mr. Ben-Jacob with the four individuals that

19   you -- I guess three we've covered, Mr.

20   Merkensteijn, Mr. Markowitz and Mr. Lhote, I

21   think were the names that we -- we mentioned.

22           I think you said there were four

23   individuals but those three names, in

24   particular, you recall?

25       A    Yeah.  My memory is that there were

1    four.

2        And -- and you asked about the

3    first transaction.  I'm -- I don't recollect

4    enough to really be able to give you a

5    coherent picture of what the first

6    transaction was.

7        Q    Do you recall generally that you

8    worked with Mr. Ben-Jacob in helping these

9    individuals with respect to a -- a dividend

10   strategy?

11       A    In general, I believe that's a

12   correct statement.

13       Q    Do you recall that the Argre

14   individuals had done some work, some

15   investing with a person called Sanjay Shah

16   and his business in London called

17   Solo Capital?

18       A    I have no recollection of that.

19       Q    Do you recall the name Sanjay Shah?

20       A    Yes.

21       Q    What do you recall about Sanjay

22   Shah?

23       A    That he was involved -- later in

24   the transaction, he was involved on behalf of

25   a company that is escaping me at the moment,

CONFIDENTIAL
Arthur Woodard - November 18, 2021

```
 1    recollection, that happened well into -- we

 2    had been working on the transaction for some

 3    time before I knew anything about Solo.

 4         Q    And did you understand that the

 5    Solo fee was about 66 percent, about

 6    two-thirds of the reclaim?

 7         A    That number sounds correct for the

 8    gross fee.  They were -- my memory is that

 9    they were responsible for all expenses, so

10    the fee came down to about 25 percent of net,

11    my memory.

12         Q    And did you understand that the

13    fee, the plans were going to pay the fee to

14    Ganymede?

15         A    No, I have no recollection of that.

16         Q    Now, you see in the -- if you turn

17    to the next page of the document.

18         A    Page?

19              MR. O'CONNOR:  Can you give a Bates

20         number?  I'm not sure what the next page

21         is.

22         Q    Sure.

23              It's -- it's the Bates number --

24    and, sir, that's the -- the long number in

25    the bottom right-hand corner.
```

CONFIDENTIAL
Arthur Woodard - November 18, 2021

Page 33

1      A     I see it.

2            I appreciate that because I would

3   not have known.

4      Q     Yeah.   That's 496.

5      A     Okay.   496.

6            MR. O'CONNOR:   Right here.

7      A     Okay.   I got -- I have it.

8      Q     And you'll see that the -- the fee

9   here is the relevant percentage multiplied by

10  the net refund amount.

11     A     I see it.

12     Q     And if you turn, sir, to the

13  document, Bates ending with 500.   5-0-0.

14     A     Yes.

15     Q     You'll see a table there where the

16  relevant percentage is 67.5 percent?

17     A     Yes, I see the table.

18     Q     And did you understand that that

19  was Solo's fee?

20     A     At some point in time I understood

21  that their fee was in the 60, the 70 percent

22  range.

23           My memory is not 67.5.   My memory,

24  it's either 65 or 66, but I -- it's very

25  foggy.

CONFIDENTIAL
Arthur Woodard - November 18, 2021

Page 53

1   not have had a contemporaneous discussion

2   about this at all.

3       Q    Now, when did you retire, sir?

4       A    June 30th, 2013.

5       Q    And do you recall any discussions

6   prior to your retirement as to whether any

7   401(k) plans set up by Mr. Markowitz, Mr. Van

8   Merkensteijn were qualified and met the

9   qualification requirements?

10      A    What I remember is some plans, I

11  cannot tell you which plans, perhaps all of

12  them, had this -- had entered into a volume

13  submitter arrangement, which, by definition,

14  means that plans are qualified.

15           I have an opinion letter from the

16  IRS that they're qualified.

17      Q    Is one of the -- is one of the

18  requirements for a qualified plan that it be

19  established and operated for the exclusive

20  benefit of the participants or beneficiaries?

21           MR. O'CONNOR:  Objection to form.

22      A    Yes, it is under 401(a).

23      Q    And was there an issue with these

24  plans if they were going to pay two-thirds of

25  the reclaims to Solo as to whether they could

CONFIDENTIAL
Arthur Woodard — November 18, 2021

Page 60

1    plan?

2            MR. BAHNSEN:  Objection to form.

3        A    I have no recollection of that.  I

4    can't even read it.

5        Q    Sir, if I could ask you please to

6    turn to Exhibit 4512.

7        A    4512.  I have it.

8        Q    Is this an e-mail that

9    Mr. Ben-Jacob sent to you on or about

10   September 3 of 2013?

11       A    It appears to be.

12       Q    Is this after you had retired?

13       A    Yes.

14       Q    And did you continue to work on

15   these transactions after you had retired?

16       A    Occasionally -- I had an

17   arrangement -- every retired partner had an

18   arrangement with the firm that if they were

19   asked to do something, they could, even

20   though I had -- for example, I had a

21   non-compete also, didn't apply to the firm

22   obviously, and I would get paid some nominal

23   amount for doing that.

24            And I believe that I consulted a

25   few times on Argre in the last six months.  I

CONFIDENTIAL
Arthur Woodard - November 18, 2021

Page 64

1    that out.

2        Q    Is there any additional issue that

3    comes to mind?

4        A    I can say that, to my recollection,

5    the greatest amount of time was -- involved

6    prohibited transactions and potential excise

7    taxes under prohibited transactions that

8    could apply to one or more entities and/or

9    individuals in this transaction.

10            I would say more than half of the

11    time probably, maybe even closer to three

12    quarters of the time that I spent was on

13    prohibitive transactions.

14        Q    Mr. Ben-Jacob goes on to say, "And

15    remind them why each is unique, et cetera."

16        A    Again -- well, why -- oh --

17        Q    Do you recall why each of these

18    major issues was unique here?

19        A    I have no idea.

20            You would have to ask Michael what

21    he meant by that word.

22        Q    He goes on to say, "And that when

23    taken together with, little i, the fact that

24    so much of this is facts and circumstances

25    that we would need to assume a way thus